Gants, Ralph D., J.
The plaintiffs, Marcia Rhodes, Harold Rhodes, and Rebecca Rhodes (collectively, “the Rhodeses”), have filed this action against the defendants AIG Domestic Claims, Inc., formerly known as AIG Technical Services (“AIGDC”), National Union Fire Insurance Company of Pittsburgh, PA (“National Union”), and Zurich American Insurance Company (“Zurich”), alleging that these insurers violated G.L.c. 176D, §3(9)(f) (and, in turn, G.L.c. 93A) by failing to effectuate a prompt, fair, and equitable settlement of a tort claim in which liability was reasonably clear. This Court conducted a 16-day bench trial between February 5, 2007 and March 31, 2007, followed by extensive briefing. Based on the testimony at trial and the exhibits admitted into evidence, viewed in light of the governing law, this Court makes the following findings of fact and conclusions of law.
FINDINGS OF FACT
In the early afternoon of January 9, 2002, Professional Tree Service was grinding tree stumps off Route 109 in Medway and had retained a Medway patrolman on paid detail to stop one lane of traffic at a time to protect the safely of its tree service truck and employee. The police officer stopped a Toyota driven by Marcia Rhodes, then 46 years old. After she came to a full stop, an 18-wheel trailer truck driven by Carlo Zalewski struck the rear of Ms. Rhodes’s car and pushed it off the road down an embankment. The tractor-trailer had struck her car with such force that the trunk had been pushed into the back seat of the vehicle. Ms. Rhodes was conscious when the police officer ran over to her aid, but she had lost all feeling below her waist. As a result of the traffic accident, she suffered, among other injuries, a fractured spinal cord at T-12 and broken ribs. The accident left her a paraplegic, unable to walk.
Zalewski at the time of the accident was employed by Driver Logistic Services (“DLS”), and had been assigned by DLS to drive the truck for GAF Building Corp. (“GAF”). GAF had leased the truck from its owner, Penske Truck Leasing Co. (“Penske”).
At the time of the accident, GAF had a $2 million primary automobile insurance policy with Zurich, and a $50 million excess umbrella policy with National Union. Under the Zurich Policy, GAF had a self-insured retention of $250,000 per claim, including defense costs, and retained the authority to approve payments up to that amount. Zurich had to approve any settlement of a claim that involved payment of more than $100,000. GAF had retained Crawford & Company (“Crawford”) as its Third Party Administrator (“TPA”) to adjust its claims and Zurich also entered into a Third Party Administrator Agreement with Crawford to adjust its GAF claims. As Zurich’s TPA for GAF claims, Crawford provided various adjustment services, including accepting and acknowledging proofs of loss, maintaining claims files, investigating all reported claims and evaluating their merits, proposing Claim Reserve guidelines, and retaining attorneys approved by Zurich to defend claims.
Crawford received notice of the claim arising from the January 9, 2002 accident involving Ms. Rhodes that same day. On January 30, 2002, John Chaney, a Senior Liability Adjuster for Crawford, issued what he characterized as his First Full Formal Report regarding the accident. Chaney classified the claim as “catastrophic,” and therefore declared that it will be reportable to both GAF and Zurich. Chaney had interviewed Zalewski by telephone on January 10, 2002, and reported that Zalewski said that he was descending a long gradual hill on Route 109, traveling roughly at the speed limit of 35 miles per hour when a car “popped out” of an intersecting street, causing him to go to his brake “vigorously.” When he saw that this car had passed, he put his foot to the gas pedal, returned his eyes from that car to the road ahead, and saw Rhodes’s car only 20-30 feet ahead. He put on his brakes, but they locked and he had too little space to stop. He said he saw no warning signs of work being done near the area of the accident. He was cited criminally for Operating Negligently to Endanger, and taken for drug and alcohol tests. The alcohol test was negative. The drug test had yet to be processed, but Zalewski denied that drugs or alcohol played any role in the accident. He said he was unaware of any defects in his truck. The police report confirmed his account, but noted that a truck traveling downhill in Zalewski’s direction on Route 109 to the accident scene would have had 800 feet of straight, clear visibility. The police report also noted that the truck had one inoperative brake, but this was not deemed a factor in the accident.
As to damages, Chaney wrote that he was not fully aware of the extent of Ms. Rhodes’s injuries, “except that we know she remains in life threatening condition at UMass Medical Center, is paralyzed, [and] suffers currently from pneumonia and pancreatic infection.” He opined that the case “will carry a high value” but that it was premature to estimate the ultimate exposure.
Chaney noted that Ms. Rhodes had retained counsel, attorney Frederick Pritzker of the law firm of Brown Rudnick Freed & Gesmer, P.C. At GAF’s suggestion, Crawford retained the law firm of Nixon Peabody, LLP to represent GAF. Chaney asked GAF to notify the excess carrier (National Union), which it did. Chaney provided a copy of this report to the Vice President for Risk Management at GAF, the attorney at Nixon Peabody representing GAF, and Zurich at its corporate headquarters in Shaumberg, Illinois.
While this Court has no doubt that Chaney indeed did send his First Full Formal Report to Zurich’s headquarters, the Report appears not to have found its way to any of Zurich’s claims representatives, probably because Zurich had not earlier been notified of the claim and had established no claims file to which it could be sent. AIGDC, which served as the claims administrator for National Union and, for all practical purposes, managed National Union’s excess insur- *144 anee claims, received a copy of this Report on February 4, 2002 because GAF’s broker gave written notice to AIGDC of the claim on that date, enclosing both the Report and the police report.[1]
Chaney’s next transmittal to GAF was on April 8, 2002, with copies sent to AIGDC and Zurich’s postal box.[2] Chaney noted that Zalewski was clearly liable for Ms. Rhodes’s injuries due to his lack of attention and he opined that Zalewski’s liability may be imputed to GAF.[3] He foresaw the possibility of contribution from Penske for faulty maintenance (although he noted that this did not cause the accident), and from Professional Tree Service and the Town of Medway for not having placed warning signs and for poorly managing traffic. He awaited the legal opinion of defense counsel as to the potential for contribution from other possible tortfeasors. He recommended that the policy limits of $2 million be put in reserve. However, no reserve was yet put in place because only Zurich had the authority to set a reserve of greater than $ 100,000, and no one at Zurich yet knew of this claim.
The next day, on April 9, 2002, Tracey Kelley, whose unusual title at AIGDC was “Complex Director” (which at AIGDC effectively meant that she was assigned complex claims, defined as claims with a potential value of more then one million dollars), wrote Chaney to inform him that she was handling the excess claim on behalf of AIGDC. She asked for copies of “all pleadings, investigative materials regarding the accident and/or damages claimed, a synopsis of any medical records received and reviewed, deposition summaries, dispositive motions and all analysis of liability and/or damages prepared by defense counsel.”
On April 16, 2002, Ms. Rhodes, for the first time since the accident, returned home. She had undergone spinal fusion surgeiy at the University of Massachusetts Medical Center following the accident and remained there for a month. She was then released to Fair lawn Rehabilitation Hospital, where she had remained for two months before being allowed to return home. At home, she was confined to a wheelchair and dependent on others to move her from her wheelchair to her bed or to the toilet. In May 2002, she was hospitalized again, this time at Milford-Whitinsville Regional Hospital, for emergency surgeiy to remove a gangrenous gall bladder. After a week of recovery, she was transferred to Whittier Rehabilitation Hospital, where she remained for two weeks before coming home in June 2002. Shortly thereafter, because of her intensive physical therapy, she developed tendonitis and bursitis in her arms and shoulders and had to stop all physical therapy to allow them time to heal.
On July 3, 2002, GAF’s law firm — Nixon Peabody— informed Penske by letter that, under their Lease & Service Agreement dated May 18, 1992, Penske was an additional insured on the GAF liability policies. Consequently, by this time, GAF understood that its liability policies with Zurich and National Union covered Zalewski, GAF, DLS, and Penske with respect to the Rhodes accident.
On July 12, 2002, Ms. Rhodes, Mr. Rhodes, and their daughter, Rebecca Rhodes, who was then 14 years old, filed a civil complaint in Norfolk County Superior Court against Zalewski, DLS, Penske, and GAF. Ms. Rhodes sought damages for her injuries; Mr. Rhodes and Rebecca sought loss of consortium damages. The claim against Zalewski was premised on his negligence in causing the accident. The claim against DLS was premised on its vicarious liability for Zalewski’s negligence, since he was a DLS employee acting within the scope of his employment at the time. The claim against GAF alleged that it was negligent in failing to exercise control over the independent contractor to whom it entrusted its leased trucks. The claims against Penske alleged two distinct legal theories: (1) that it was negligent in failing to exercise control over the independent contractor to whom it entrusted the trucks it owned, and (2) that it was legally responsible under G.L.c. 231, §85A for the conduct of the driver who drove the truck it owned.[4]
Although Chaney’s notes reflect that he sent a copy of the Rhodes complaint to Zurich at its Illinois headquarters on or about August 1,2002, Zurich only learned of the case when it was asked to resolve a dispute that had arisen between GAF and Penske. Although GAFs attorney had informed Penske by letter on July 3 that Penske was an additional insured on GAF’s policies, GAF changed its position after suit was brought and told Penske that it would neither defend nor indemnify Pen-ske as to the claim. GAF also contended that there would be a conflict if Nixon Peabody were to represent Penske, and that Penske needed to retain separate counsel. On August 7, 2002, Chaney sent a “formal letter of notification” to Zurich and, perhaps most importantly, telephoned David McIntosh, a claims director at Zurich, to inform him of the coverage dispute with Penske. With personal contact finally having been made with a Zurich claims director, Chaney faxed to McIntosh various papers in his claim file (but omitted his First Full Formal Report and April 8, 2002 transmittal) and Zurich belatedly opened a claim file on August 21, 2002.
Zurich did not immediately take any action as to the Rhodes claim apart from resolving questions of coverage. McIntosh referred the matter to Zurich’s coverage counsel to determine who was covered under the GAF policy. Zurich agreed to pay for Penske’s separate counsel under a reservation of rights.
On August 30, 2002, the Rhodes filed an amended complaint which added a negligent maintenance claim against Penske. On September 27,2002, the Rhodeses served their first set of requests for the production of documents to all defendants. Little new transpired as discoveiy proceeded. Although Crawford appears to have obtained no new information of consequence and had not received any of Rhodes’s medical records, its view of the value of the case appeared to solidify. *145 Chaney’s transmittal letter of September 25, 2002, which was sent directly to McIntosh at Zurich, estimated the potential case value as between $5 million and $10 million. He also continued to recommend that the case be reserved at the policy limits of $2 million.
On November 21, 2002, Zalewski admitted to sufficient facts to support a finding of guilt as to his criminal charge in District Court and apologized for what he had done. Ms. Rhodes prepared a detailed written victim impact statement for his sentencing.
On May 6, 2003, Jody Mills, who had taken over as adjuster of the Rhodes file at Crawford, prepared a transmittal letter which noted that GAF’s attorney in the Rhodes case had said that he did not expect the case to run its usual litigation course because of the severity of Ms. Rhodes’s injuries. Counsel said that Ms. Rhodes’s medical expenses would approach $1 million, but no demand had yet been made by Rhodes’s counsel. Mills, like Chaney before her, continued to estimate the potential case value as between $5 million and $10 million.
In early June 2003, McIntosh of Zurich asked Mills for a full formal report, which she provided to him on June 4, 2003. Her report noted that Rhodes’s attorney had yet to submit a demand or provide medical records. She also noted that she did not yet have a copy of Rhodes’s medical records, although she understood that they had been provided in discovery to GAFs counsel.
In a transmittal letter dated July 22, 2003, Mills wrote that she had been advised by GAF’s counsel that Rhodes’s attorney had made an oral settlement demand of $18.5 million, with incurred medical expenses estimated at $1.3 million and future medical expenses estimated at $2 million. He also told her that Rhodes’s attorney would be providing a more detailed written demand, along with a “day in the life” videotape. Mills at this time had yet to obtain the medical records from GAF’s counsel, even though Zurich had asked for a copy, but she hoped they would be included with the written demand.
The written demand, along with the “day in the life” videotape, was provided to GAF’s counsel on August 13, 2003, but the amount of incurred medical expenses ($413,977.68) was less than half of what orally had been represented.[5] Perhaps as a consequence, the amount of the written demand ($16.5 million) was below the oral demand. This demand included special damages totaling $2,817,4.19.42, comprised of:
incurred medical expenses of $413,977.68:
the present value of combined future medical costs arising from her paraplegia of $2,027,078;[6]
the loss of household services of $292,379; and
out-of-pocket expenses of $83,984.74.
The demand was carefully documented and included all Rhodes’s medical records, along with Pollard’s life care plan and an expert economist’s report regarding the value of lost household services and present value calculations. The “day in the life” videotape chronicled what was described as a typical day for Ms. Rhodes, which depicted the enormous time and effort needed to move her from her bed to her wheelchair, to bathe her, to feed her, and to prepare her for bed, as well as the nursing care and home assistance needed to assist her with these mundane, everyday needs.
McIntosh changed his duties at Zurich in late August or early September 2003, so the Rhodes claim file was reassigned to Katherine Fuell. McIntosh did not brief her on the claim or provide her with any background; she was left to get up to speed on the claim based solely on the contents of the claims file at Zurich and her review of McIntosh’s contemporaneous typed notes, which every claims director was required to make and which were referred to as “Z notes.” The last two Z notes. McIntosh wrote before the transfer to Fuell reflected his frustration with the paucity of investigation conducted and the information provided by Crawford. Under Zurich’s TPA agreement with Crawford, it was Crawford’s job to serve as the case manager, to manage the litigation, and to ensure that the insureds had an effective and strategically sound legal defense, but Zurich ultimately had to resolve the claim. His June 11, 2003 “Z note” observed that he needed a “complete damage picture” — "full injury information, the medical costs both past and future, likewise we need the same for earnings." He also wanted defense counsel to conduct verdict research regarding the likely verdict in the case, and a litigation plan setting forth the current status of the case and the plan for moving forward. His last “Z note,” dated August 25, 2003, said simply, “I have heard nothing from the TPA.”
On September 11, 2003, Mills sent a letter to McIntosh (apparently still believing he was handling the claims file at Zurich) regarding the status of the case. She enclosed a copy of Rhodes’s written demand, as well as a copy of the “day in the life” videotape. It is useful to summarize what information Fuell had in her possession once she received this letter and its attachments in mid-September 2003:
Based on the medical records included by Rhodes’s counsel in the written demand, it was plain that Ms. Rhodes had been rendered a paraplegic as a result of the accident and that she would remain a paraplegic until she died.
Based on the medical records and the day-in-the-life videotape, it was plain that Ms. Rhodes’s life after the accident had become very confined, with a large share of her waking hours devoted to performing the mundane tasks that used to take her only minutes. It was less plain what the long-term prognosis was for her to lead a more normal life, albeit limited by her paraplegia, if she could lift herself onto a wheelchair, operate a motorized wheelchair, and learn to drive a minivan accommodated to her limitations.
The documented medical expenses already incurred had reached more than $410,000, and there *146 were likely to be substantial future medical and everyday expenses arising from her paraplegia.
Zalewski was nearly certain to be found negligent in the accident. While Zurich was paying for his defense under a reservation of rights, there should have been little question that he was covered by GAF’s Zurich policy, since the policy covered anyone occupying a covered automobile, and a covered automobile included any vehicle leased for a term of six months or more, which included the tractor-trailer that GAF leased from Penske which was driven by Zalewski.
There was no evidence that Zalewski was separately covered by his own automobile accident policy, but there was no verification yet that he had no other primary insurance. DLS, as Zalewski’s employer, was nearly certain to be found vicariously liable for Zalewski’s negligence. As with Zalewski, there was yet no evidence that DLS had its own primary insurance but there was also no verification that it had no primary insurance. GAF’s coverage counsel on May 29, 2003 had asked in writing for the defense attorney jointly representing Zalewski and DLS to furnish all relevant insurance policies, but the defense attorney had so far ignored the letter and provided no response.
There was some possibility that Penske would be found negligent for its failure to maintain the brakes, but it did not appear that flawless brakes would have prevented the accident.
Professional Tree Service had been deposed and defense counsel intended to seek leave to add it as a third-party defendant in the action because of its alleged failure to provide adequate warning signs around its work area. At the time, Crawford understood that it had a $3 million policy. In fact, it had two policies, each with a $1 million limit, only one of which would provide coverage.
Crawford was consistently recommending that the reserve be established at the $2 million policy limits.
With respect to the litigation, Zalewski had been deposed but none of the three Rhodeses had yet been deposed. Nor had anyone asked Ms. Rhodes to undergo an Independent Medical Examination. Defense counsel had agreed that a defense life care planner should be retained to prepare a life care plan, which could then be compared with the plan devised by Rhodes’s life care planner.
On September 24, 2003, Mills prepared another transmittal letter that dropped the potential case value from $5-10 million to $5-7 million because the incurred medical expenses were less than half of the amount that she had been told. The letter reflects that mediation had begun to be discussed among counsel, because it notes that Rhodes’s attorney had asked for a good faith offer before he would agree to mediation.
Early in October 2003, Fuell sent forms to Crawford asking GAF’s defense counsel, Greg Deschenes of Nixon Peabody, to provide a case evaluation regarding the strength of the Rhodeses’ case and of any legal defenses. In the second week of November 2003, Fuell received two documents that triggered her request for a conference call with defense counsel, Crawford, and AIGDC, which occurred on November 19, 2003.
The first triggering document was a transmittal letter from Mills dated November 13, 2003 that used stronger language than any she had used before. Although Crawford had repeatedly requested that the reserve be increased to the policy limits, Zurich had yet to take any action, which left the reserve at $50,000 — the limit of the reserve that Crawford alone could authorize. Mills noted that the inadequate reserve could be seen as improper if a regulatoiy agency examined Zurich’s financials, and urged that the reserve be increased to $2 million “at once to keep on the correct side of regulators.” For the first time, Mills reported that, according to DLS’s attorney, DLS had no insurance coverage of its own due to an error by its insurance agency. Therefore, there was no indication that any defendant likely to be found liable, apart from the third-party defendant Professional Tree Service, held any primary insurance that could share in the liability. Mills reported that it was unproductive to continue the infighting among the defendants and that atténtion should instead be focused on moving to a good settlement posture. She noted that Rhodes’s attorney was a “successful big case lawyer,” that his demand was not unreasonable in light of the special damages of nearly $3 million, and that he was “attempting to set up defendants for a 93A violation by making an early demand, asking for a good faith offer before submitting to non-binding arbitration.” She “strongly” endorsed surrendering Zurich’s policy limits of $2 million as a good faith position prior to mediation. She also noted that it would be better if only one insurer managed the mediation and that this could be accomplished by tendering the policy limits, essentially leaving it to AIGDC to mediate the case.
The second triggering document was Deschenes’s case evaluation, which was sent to Crawford and received by Fuell at or around the same time as Mills’s transmittal letter. Zurich did not waive its attorney-client privilege, so the content of this document remains unknown to this Court. However, based on Deschenes’s testimony at trial, it is plain that Deschenes was eager to move the case to mediation. In June 2003, before receiving Rhodes’s written demand, he had suggested to Rhodes’s attorney that they stay discovery and proceed straight to mediation, but Rhodes’s attorney refused to agree to a stay. However, he and Rhodes’s attorney had agreed to proceed to mediation without first deposing Marcia and Rebecca Rhodes, sparing them the burden of being deposed unless the mediation failed. Late in October 2003, Deschenes telephoned Mills to ask for the authority to make an offer, since Rhodes’s attorney had insisted upon an offer as a precondition to mediation.
*147 The participants in the conference call on November 19 were GAF’s insurance broker, GAF’s inside counsel and risk management vice president, Fuell from Zurich, Deschenes, and Nick Satriano, AIGDC’s Complex Director. Satriano had taken over the Rhodes excess claims file at AIGDC in June 2003.[7] Deschenes reviewed with the others the status of the case, the theories of liability, the defenses, and the likely damages. Deschenes informed them that Rhodes’s attorney had asked for a good faith offer as a precondition to entering into mediation. Fuell said that she did not personally have the authority at Zurich to tender the $2 million policy limits, but she intended to ask her superiors for approval of such a tender. The conferees agreed that $2 million was not going to cover the settlement and that AIGDC would have to put up money for the case to settle. Deschenes pressed for a preliminary offer of $5 million prior to mediation.
Satriano was unhappy about being pressed to put up money before he was up-to-speed on the case. He had only passively reviewed the claims file at AIGDC, and it only contained the Crawford reports, which he felt to be conclusoiy and unreliable. The conference call was the first time he had spoken to Deschenes about the case. He told the conferees that he was new to the file and did not have much of the information that was being discussed at the conference. He asked Deschenes to send him a copy of his file and all the information he had. He said he would study that information and become fully involved in the case. He also said he wanted to bring in associate counsel, that is, he wanted to add to the GAF defense team Attorney William Conroy from the law firm of Campbell & Campbell to jointly represent GAF and AIGDC in the lawsuit. He was challenged by others as to the need for associate counsel, but Satriano did not back down, since he did not have confidence in Deschenes and did not think he was sensitive to the needs of an excess insurer.
Satriano vigorously disagreed with the recommendation that they should offer $5 million prior to the mediation, and refused to commit at that time to putting up any AIGDC money towards a settlement offer. Both Satriano and Fuell understood from Deschenes that Rhodes’s attorney had demanded $5 million as “the price of admission” to mediation. In fact, Rhodes’s attorney had never stated this or any other number; he had simply insisted upon a good faith offer prior to mediation to ensure that the mediation would not be a waste of time. Rather, Deschenes believed the $5 million to be a good faith preliminary offer and pressed the insurers to offer it, and they conflated his recommendation with Rhodes’s attorney insistence upon a good faith offer. This misunderstanding was never corrected; Satriano and Fuell left the conference with the understanding that Rhodes’s attorney had refused to enter into mediation unless the insurers first made an offer of no less than $5 million.
The conference ended with Fuell committing to request authority within Zurich to tender the $2 million policy limits, and asking Deschenes to provide her with the information she needed to make that request. Satriano committed to read the case materials that Deschenes was to provide him but did not commit to any offer.
On November 24,2003, Deschenes sent Satriano the demand letter, medical records, preliminary defense life care planner report, pleadings, case evaluations, and various reports. Satriano did bring in Conroy as associate counsel in December, and Conroy on December 24 asked Deschenes to send him all “correspondence, pleadings, depositions, and all discoverable documentation” for his review, but asked him to hold off on sending him the 10 boxes of discovery materials.
Following the meeting, Fuell went to work to prepare the BI Claim Report, which was a prerequisite to her obtaining authorify at Zurich to tender an amount as large as $2 million. On or about December 5, 2003, she had received the final version of the defense life care plan, prepared by Jane Mattson, which determined that Ms. Rhodes life care costs would total $1,239,763, which was $787,315 less than the present value of Ms. Rhodes’s combined future needs in her demand letter.[8] The primary differences between the plaintiff and defense life care plans were that the defense life care plan assumed a shorter life span for Ms. Rhodes (24 years vs. 28.9 years), provided fewer hours per week for home care aides, and assumed that she could reside in the Rhodes’s living room rather than in her own modified bedroom.
On December 19, 2003, Fuell submitted her BI Claim Report, which asked for approval before the end of the year to tender the $2 million policy limits to AIGDC. She stated that the probability of a plaintiffs verdict was 100 percent, and that there was no possibility of a finding of comparative negligence. She estimated, with respect to the damage award for pain and suffering, a 10 percent risk of an award of $11 million, a 50 percent risk of an award of $12.25 million, and a 10 percent risk of an award as high as $13.75 million damage. She gave an estimated value of the total damage award as nearly $17.88 million. Fuell, however, badly misstated the amount of past medical bills in her Report, describing them as $2,817 million, which was the total amount of special damages in the demand letter; the past medical bills were $413,977.68. As a result, her special damages, even with her low end estimate, was $4,317 million, which was $1.5 million more than the special damages estimate in Rhodes’s demand letter. Even eliminating this error, however, it is plain that Fuell in her Report anticipated a total damage award of considerably more than $10 million.
Fuell had sent her Report to Kathy Langley at Zurich, not realizing that Langley was leaving Zurich at the end of that month. Langley told her between Christmas and New Year’s Day that she had recommended approval of the full tender to Thomas Lysaught of Zurich, who was *148 to make the decision, but had yet to hear from him. On January 21, 2004, Fuell emailed Lysaught directly and asked if he had reviewed her request for authority to tender the $2 million policy limits. Lysaught gave his approval on January 22.
On January 23, 2004, Fuell telephoned Satriano at AIGDC and verbally tendered to AIGDC the policy limits. Satriano said he would not accept a verbal tender and needed it in writing. He added that the writing needed to address whether Zurich was simply tendering its policy limits and would continue to pay for the defense of the case, or whether it was also tendering the defense obligation, i.e. whether it would refuse to pay any longer for the defense upon the tender. She told him she would need to review the policy to determine Zurich’s defense obligation upon tender and would send him a letter incorporating the correct policy language. She added that, while she would get him a written confirmation, Zurich intended to tender its policy limits and has already advised both the client and the broker of the tender. Satriano admits that, as a result of this telephone call, he knew that he had Zurich’s $2 million available for any settlement.
Fuell had not responded to Satriano in writing by February 13, 2004, and Satriano grew concerned about the risk of confusion as to whether Zurich was seeking to tender its defense obligations along with its policy limits. That day, he emailed Fuell that AIGDC had not yet received any formal offer of tender, that any formal offer must be in writing, and any written offer may not be communicated by email. He added that “my current understanding is that the primary insurer has NOT relinquished their duly to defend the insured in this litigation” and that he expected Zurich, as primary insurer, to continue its obligation to defend regardless of any tender. Fuell replied that day by email that she had never stated that Zurich was “in any way relinquishing our defense obligations to the insured ...” She said that she expected to have access to the policy when she returned to the office on Monday so that she can provide written notification to him. She ended by reiterating that, even without a formal writing, Zurich has offered the full limits of its policy to AIGDC, and AIGDC can rely upon that tender in communicating a response to plaintiffs’ demand.
Although he did not yet have a formal writing from Zurich memorializing the tender, Satriano certainly understood that he had Zurich’s tender because he attended a meeting on March 4, 2004 at GAF’s home office in New Jersey to discuss the case without inviting Zurich. On March 1, a few days before this meeting, the Rhodes had moved to amend their complaint against GAF to add a count under a federal motor carrier’s statute which would plainly have made GAF vicariously liable for Zalewski’s negligence. The motion to amend, over GAF’s objection, was allowed on March 16. As a result, GAF, which before was defending a claim that it had negligently failed to supervise an independent contractor, was now defending a vicarious liability claim based on Zalewski’s negligence, and consequently had essentially no chance of escaping liabiliiy.
Present at the March 4 meeting, apart from Satriano, were various GAF representatives, Deschenes, Conroy, and GAF’s insurance broker. At this meeting, Deschenes presented the results of the jury verdict and settlement research he had conducted, which focused on automobile accident cases, mostly in Massachusetts, in which liability was probable or reasonably clear and which involved severe damages, many of them resulting in paraplegia. The average settlement among these comparable cases was $6,647,333; the average verdict was $9,696,437. GAF wanted to respond to Rhodes’s demand, which had increased in December 2003 to $19.5 million. All thought that Rhodes’s demand was too high, but no one suggested that it was unworthy of a response. Satriano, however, was adamantly opposed to making a $5 million offer prior to mediation or to making any offer in order to cause Rhodes’s attorney to agree to mediation. He said he was willing to go to mediation but did not want to set an improper artificial starting point for the mediation. Since AIGDC was not willing to make an offer prior to mediation and Pritzker had earlier said that an offer was a precondition to mediation, this meeting accomplished little towards agreeing upon a settlement posture. At the close of the meeting, Satriano simply told Conroy to tell Pritzker that they were still working on a response to his settlement demand and would get back to him.
The meeting, however, did provide some guidance regarding litigation strategy. Conroy said he had identified a physiatrist (an expert in physical medicine) to conduct an Independent Medical Examination (“IME”) of Ms. Rhodes to determine the severity of her present condition and her ability to recover some functioning through rehabilitation. There was also some discussion of deposing Ms. Rhodes and her daughter, but no decision was made as to whether to proceed with their depositions before any mediation.
For all practical purposes, the failure to develop a settlement position at this March 4 meeting meant that no reasonable settlement offer would be presented before the pretrial conference on April 1, 2004, since Satriano knew at the meeting that he had been called to active military duly in Iraq and that responsibility for the Rhodes excess claim file at AIGDC was to be transferred in his absence to Richard Mastronardo, who did not attend the meeting.
GAF’s coverage attorney, Anthony Bartell, was so frustrated by AIGDC’s unwillingness to agree upon a settlement offer that he wrote Satriano on March 18 that AIGDC’s failure to commence settlement negotiations with Rhodes’s attorney despite his settlement demand more than seven months ago violated its obligation under G.L.c. 176D, §3(9)(f) “to effectuate prompt, fair and equitable settlements of claims in which liabiliiy has *149 become reasonably clear.” He also Informed Satriano that, once Zurich formalized its tender, GAF would offer Zurich’s $2 million to the Rhodes to settle their claims.
Zurich did not resolve the question of its defense obligations upon tender until March 29, 2004. Fuell wrote Mastronardo a formal letter stating that Zurich was tendering its $2 million policy limits and that its duly to defend the insured and additional insureds under the Policy ended with the tender. The letter quoted the provision of the Zurich Policy that declared:
Our duly to defend or settle ends . . . when we tender, or pay to any claimant or to a court of competent jurisdiction, with the court’s permission, the maximum limits provided under this coverage. We may end our duty to defend at any time during the course of the lawsuit by tendering or paying the maximum limits provided under this coverage, without the need for a judgment or settlement of the lawsuit or a release by the claimant.
The letter stated that, effective April 5, 2004, Zurich was transferring all its defense obligations to AIGDC. The letter asked to whom the $2 million check should be made payable to and to whom it should be sent.
Mastronardo orally rejected Zurich’s March 29 formal written tender because of its attempt to transfer to AIGDC the defense obligation. He stated that AIGDC had no defense obligation under its excess policy and that the issue of legal fees needed to be resolved between Zurich and GAF. On April 2, 2004, Martin Maturine, AIGDC’s Complex Director for Excess Specially Claims, wrote Zurich to confirm that it had rejected Zurich’s tender of primary policy limits. AIGDC’s rejection of the tender was spurious. Matur-ine focused on the provision in the National Union Policy that declared that National Union “shall have the right and duty to defend any claim or suit seeking damages covered by the terms and conditions of this policy” when the limits of all underlying insurance policies providing coverage to the insured “have been exhausted by payment of claims to which this policy applies” (emphasis in Maturine letter but not in Policy). In essence, AIGDC was declaring that its duty to defend commenced only upon payment of policy limits so it was going to reject the tender of those limits in order to prevent such payment from occurring.
On April 2, 2004, Fuell informed GAF and all counsel that, in light of AIGDC’s rejection of its tender, Zurich had made a “business decision” to continue to pay all defense costs in the Rhodes litigation. Fuell said that Zurich had offered to deposit its $2 million tender in an escrow account and reserved its rights to recover its defense costs from AIGDC.
Soon after the formal tender on March 29, before the April 1 pretrial conference, Deschenes, on behalf of GAF, offered Pritzker $2 million to settle the Rhodes’s claims and invited Pritzker to mediate the case. Pritzker considered the offer wholly inadequate, and said he wanted to mull over whether mediation was worth doing in light of that offer. A few weeks later, however, Pritzker agreed to mediate, and invited the defendants to select a mediator.
While the Rhodes were willing by mid-April 2004 to proceed to mediation, AIGDC did not wish to proceed to mediation until it had concluded the additional discovery it now insisted it needed. After Satriano left for Iraq, Maturine took over as the Complex Director of the Rhodes claim file and Tracey Kelly, who had been the Complex Director in charge of the file in April 2002, was promoted to Complex Claims Supervisor and assumed supervisory authority over the case. They did not wish to proceed to mediation until Marcia and Rebecca Rhodes had been deposed, the IME of Marcia Rhodes had been completed, and they had obtained Marcia Rhodes’s prior psychological records. They also wanted to explore various insurance coverage issues which they felt had not been adequately resolved — the amount of coverage carried by Professional Tree Service and whether Zalewski was a covered person under the Penske policy.
Pritzker would not agree to hand over Ms. Rhodes’s psychological records, so defense counsel filed amotion seeking such discovery, which was denied on June 11, 2004. Since the discovery deadline had passed, defense counsel also filed a motion on June 18, 2004 to extend discovery and extend the trial date.[9] On July 8, 2004, Superior Court Judge Elizabeth Donovan denied the motion but permitted the depositions of Marcia and Rebecca Rhodes to proceed, since Pritzker had earlier agreed with defense counsel that they could be postponed beyond the discovery deadline.
The mediation was scheduled for August 11, 2004. The IME of Marcia Rhodes was conducted on July 20, 2004 by the defendants’ expert physiatrist. Marcia Rhodes was deposed on August 4,2004. Rebecca was not deposed until August 25, 2004, after mediation failed.
Maturine left AIGDC in June 2004 so yet another Complex Director, Warren Nitti, was assigned to the Rhodes file. He was asked to compile a narrative report regarding the Rhodeses’ claim, which he completed on August 3, 2004. Nitti recommended that authority be given to pay a settlement of $6 million, but Kelly overruled him and authorized a settlement of only $4.75 million. She intended to offer a structured settlement with an annuity to pay for Ms. Rhodes’s life care plan, because the annuity could be obtained for less than the value of the life care plan and offered tax advantages to the Rhodes. While Kelly, on behalf of AIGDC, gave settlement authority up to $4.75 million, she understood that this would include only $1.75 million of AIGDC’s monies, since $2 million of the settlement was to come from Zurich’s policy and she assumed that the remaining $1 million would come from Professional Tree Service, who AIGDC had determined had $1 million in coverage *150 and figured would be willing to pay policy limits in order to avoid the risk of far greater exposure at trial.
At the mediation on August 11, which was attended, among others, by Pritzker, Nitti, and Attorney Peter Hermes on behalf of Professional Tree Service, the Rhodeses made an initial settlement demand of $15.5 million, plus defense payment of Ms. Rhodes’s health insurance premiums for the remainder of her life. Nitti, on behalf of the GAF-insured defendants, counter-offered with $2.75 million. After further discussion, the Rhodeses counter-offered with $15.0 million, and Nitti increased the defendants’ counter-offer to $3.5 million. Meanwhile, Professional Tree Service reached a separate settlement with the Rhodeses, agreeing to pay them $550,000 for a release. Nitti never offered the full amount of his authority of $3.75 million. Nor did AIGDC revisit whether to increase Nitti’s authority after it learned that the Tree Service had settled for $450,000 less than AIGDC had anticipated. In retrospect, it is now clear that the mediation was doomed to fail in view of the positions taken by the Rhodes and AIGDC. Mr. Rhodes, who effectively spoke for the family as to settlement, would not have accepted any settlement offer at mediation less than $8 million and no one involved in this case at AIGDC would have agreed at mediation to pay that amount to resolve the case.
After the mediation, defense counsel deposed Rebecca Rhodes and attempted again to persuade the court to grant them access to Ms. Rhodes’s prior psychological records, asking the court to conduct an in camera review of those records to determine their relevance at trial. This motion, filed on an emergency basis on August 19, was denied on August 23.
No settlement negotiations were conducted or further counter-offers communicated before trial commenced on September 7, 2004. Just prior to the trial, Zalewski, DLS, and GAF stipulated to their liability, meaning that the trial would only decide the questions of Penske’s liability and the amount of damages suffered by the Rhodes. During the course of trial, the parties stipulated to the dismissal of all claims against Penske, leaving only damages to be decided by the jury.
Nitti attended the trial and reported that it was progressing more favorably to the Rhodeses than AIGDC had anticipated. After the close of evidence but before closing arguments, Nitti, having obtained authority from AIGDC, increased its offer to $6 million, which included Zurich’s $2 million, but not the Tree Service’s $550,000. Pritzker did not communicate that offer to the Rhodeses, effectively rejecting it. When the jury returned with its verdict on September 15, it awarded Ms. Rhodes $7,412,000 for her injuries, Mr. Rhodes $1.5 million on his consortium claim, and Rebecca Rhodes $500,000 on her consortium claim, for a total award of $9,412 million, not including the 12 percent simple interest that had accrued in the roughly 2 yeans and two months since the complaint had been filed, which added roughly another 26 percent to the total. Judgement entered for the Rhodeses on September 28, 2004. After deducting the $550,000 settlement with Professional Tree Service, all of which was paid to Ms. Rhodes, the total amount due from the GAF-insured defendants was roughly $11.3 million.
On October 8, 2004, Nitti sought internal approval within AIGDC to prosecute an appeal. The proposed appeal had two grounds: (1) the alleged excessiveness of the verdict, and (2) the court’s denial of the defendants’ motions to obtain Ms. Rhodes’s psychological records in discovery. Nitti declared there was a “possibility” of gaining a new trial based on the denial of the psychological records; he admitted that “[t]he chances of obtaining relief on remittitur are more remote.”
On October 18, 2004, the defendants moved for anew trial or, in the alternative, remittitur. On November 10, they filed notice of appeal. Their new trial motions were denied on November 17. On November 19, the Rhodeses sent a Chapter 93A demand letter to Zurich and AIGDC, alleging that they had engaged in unfair settlement practices in violation of G.L.c. 176D, §3(9) (f) by failing to effectuate a prompt, fair and equitable settlement. They demanded a reasonable settlement within 30 days.
AIGDC responded to the Chapter 93A demand letter on December 17, 2004 by offering $7.0 million, of which $1.25 million would go towards purchasing a life care plan for Ms. Rhodes. This offer included Zurich’s $2 million, but did not include the $550,000 already obtained from Professional Tree Service. This settlement offer required the Rhodeses not only to release all defendants as to the personal injury claims but also to release all claims under Chapters 93A and 176D. Zurich responded on December 22, 2004 by paying the Rhodes $2,322,995.75 without obtaining any release, which included its $2 million policy limits plus accrued post-judgment interest on the entirely of the underlying judgment from the date that judgment entered. The Rhodeses replied by filing this action on April 8, 2005.
AIGDC increased its structured settlement offer on May 2, 2005 to $5.75 million, which, when one includes the amounts paid by the Tree Service and Zurich, brought the total amount to $8.62 million. Pritzker replied on May 12, insisting that the Rhodeses would settle for nothing less than the entirety of the settlement, plus interest. On June 2, 2005, after further negotiations, Pritizker confirmed in writing the terms of the Rhodeses’ settlement with AIGDC: AIGDC would withdraw the defendants’ appeal and pay the Rhodes $8,965 million, with $3 million to be paid on July 5, another $3 million to be paid on August 5, and the $2,965 million balance to be paid on September 5. Adding the amounts paid by Zurich and the Tree Service to this total, the plaintiffs obtained roughly $11.835 million in settlement of their tort action. The Rhodeses did not promise to dismiss their Chapter 93A action against AIGDC as part of the settlement.
CONCLUSIONS OF LAW
G.L.c. 176D, §3 sets forth various acts that are defined as “unfair or deceptive acts or practices in the business *151 of insurance,” and therefore violations of G.L.c. 93A, §2. G.L.c. 176D, §3. Among these forbidden acts are various “unfair claim settlement practices,” of which the best known is “[flailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.” G.L.c. 176D, §3(9)(f). As our appellate courts have interpreted this provision, some flesh has been added to the spare bones of this statutory obligation. These interpretations have made clear that:
1. The obligations in G.L.c. 176D, §3(9)(f) are not simply owed to the insurance company’s policyholders, but also to those third parties making claims against its policyholders. See, e.g., Clegg v. Butler, 424 Mass. 413, 419 (1997).
2. To “effectuate” a settlement means to make a settlement offer. See, e.g., Hopkins v. Liberty Mutual Insurance Company, 434 Mass. 556, 567 (2001).
3. The obligation to make a settlement offer is triggered only when “liability has become reasonably clear,” and “liability encompasses both fault and damages.” Clegg v. Butler, 424 Mass. at 421; Metropolitan Property and Cas. Ins. Co. v. Choukas, 47 Mass.App.Ct. 196, 199 (1999).
AIGDC argues that, in a tort case such as this where the accident resulted in paraplegia, damages are not reasonably clear until the jury renders its verdict because the damages arising from the pain and suffering of the accident victim and the loss of consortium of her spouse and children are inherently unclear and unquantifiable. The Supreme Judicial Court has plainly rejected this proposition, which would effectively negate the statutory obligation of insurance companies to make a prompt and fair settlement offer in nearly all tort cases. See Clegg v. Butler, 424 Mass. at 421; Hopkins v. Liberty Mutual Insurance Company 434 Mass. 556, 567-78.
In Clegg, the accident victim’s car had been struck in a head-on collision and he suffered serious injuries that certainly would have justified a substantial award for pain and suffering. 424 Mass. at 414-15. The Supreme Judicial Court nonetheless affirmed the trial judge’s finding that it was a “ 100% liability case against the insured,” and that the insurance company therefore was obliged to have made a settlement offer within 30 days of plaintiffs Chapter 93A letter demanding a-settlement offer. Id. at 421. In Hopkins, the accident victim’s car was struck from the rear and pushed into the vehicle in front, resulting in a spinal injuiy that permanently prevented the plaintiff from returning to her work as a plumber. 434 Mass. at 557-58. Even though these injuries would have resulted in substantial pain and suffering, the Supreme Judicial Court still found that liability was reasonably clear and, therefore, that the insurance company had an obligation to make a settlement offer within 30 days of its receipt of the plaintiffs Chapter 93A demand letter. Id. at 560-61, 569. In contrast, in O’Leary-Alison v. Metropolitan Property & Cas. Ins. Co., even though negligence was plain because the plaintiff had been rear-ended by the defendant’s car, the Appeals Court found that liability was not reasonably clear in large part because the independent medical examiner found no physical condition warranting treatment. 52 Mass.App.Ct. 214, 217-18 (2001).[10]
Therefore, when the Supreme Judicial Court speaks of damages being reasonably clear, it effectively means that (1) it is reasonably clear that the plaintiff has suffered substantial injuiy caused by the negligence of the defendant, and (2) the extent of those injuries is reasonably clear. It does not mean that it is reasonably clear how much a jury would award the plaintiffs for pain and suffering or loss of consortium, because juries hearing the same evidence plainly will differ in the amounts they award to compensate plaintiffs for these intangible losses.
4. An insurance company is entitled to delay making a settlement offer until liability — negligence and damages — is reasonably clear and may conduct a diligent investigation to determine whether liability indeed is reasonably clear. As the Supreme Judicial Court declared in Clegg:
Insurers must be given the time to investigate claims thoroughly to determine their liability. Our decisions interpreting the obligations contained within G.L.c. 176D, §3(9), in no way penalize insurers who delay in good faith when liability is not clear and requires further investigation.
424 Mass. at 413. A corollary to this principle is that an insurance company may not unreasonably delay making an offer once its investigation has determined that negligence and damages are reasonably clear. Nothing bars an insurance company from continuing its investigation in the hope that it will uncover new information that may pinpoint the precise amount of damages or disprove damages that otherwise appeared reasonably clear, but it may not postpone its settlement offer while it pursues these investigative possibilities.
5. The reasonable clarity of damages depends on the amount of the policy limits. In a catastrophic injuiy where negligence is not materially disputed, damages are reasonably clear to the primary insurer with modest policy limits once it is reasonably clear that the amount of damages will exceed those policy limits, even if the total scope of damages is not yet reasonably clear. See Clegg, 424 Mass. at 421-22 (since primary insurer knew or should have known that Clegg was permanently and totally disabled from work, there was no reasonable doubt that the damages exceeded the $250,000 available under the primary policy). Consequently, damages may be reasonably clear to the primary insurer before they are reasonably clear to the excess insurer.
*152 Armed with these interpretations, this Court will now determine whether Zurich and/or AIGDC breached its statutory obligation “to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.” G.L.c. 176D, §3(9) (i).
Did Zurich Breach Its Obligations as a Primary Insurer under G.L.c. 176D, §3(9)(f)?
In the instant case, it was reasonably clear by January 30, 2002, when Crawford, Zurich’s TPA, issued its First Full Formal Report, that Zalewski was negligent in causing Ms. Rhodes’s injuries in the accident, that Ms. Rhodes was not comparatively negligent, and that Ms. Rhodes suffered catastrophic injuries from the accident. The scope of her damages, however, could not have been reasonably clear at least until August 13, 2003, when the Rhodes made their written settlement demand, which set forth the amount of medical expenses she had incurred. The calculation of the amount of medical expenses had gotten so confused that the Rhodes needed to delay the submission of this settlement demand until their attorneys could sort out this confusion and determine why the totals claimed by Ms. Rhodes’s health insurer did not match the amount claimed in her medical bills. This confusion had caused the Rhodeses to declare in an answer to an interrogatory that her medical expenses exceeded $1 million when they totaled less than half that amount— $413,977.68 — at the time of their settlement demand. In short, it was not even reasonably clear to plaintiffs’ counsel how much Ms. Rhodes had incurred in medical bills until August 2003, and that calculation was the necessary starting point for any calculation of total damages.
The life care plan for Ms. Rhodes’s future medical needs comprised roughly $2.03 million of the roughly $2.8 million in special damages claimed by the Rhodeses in that demand letter. Zurich was not obliged to accept the life care plan estimates made by Rhodes’s expert; it was entitled, as part of its due diligence in determining the amount of damages that were reasonably clear, to retain its own life care expert to prepare her own estimates and to analyze Rhodes’s expert’s life care plan. Since the Rhodes’s life care plan was provided to the defense in mid-August, the slowest summer month of the year, Zurich acted with reasonable timeliness in obtaining Mattson’s preliminary estimates from her life care plan on October 2, 2003. From that estimate of roughly $1.49 million, it should have been reasonably clear that Ms. Rhodes’s special damages alone, based solely on medical bills that were now in Zurich’s possession and its own life care expert’s preliminary estimate, totaled more than $1.9 million. Since there was no doubt that Ms. Rhodes had been rendered a paraplegic and that she and her family were entitled to substantial damages for pain and suffering and loss of consortium, it should have been reasonably clear by October 2,2003 that the total damages incurred from the accident would far exceed the Zurich policy limits of $2 million.
This does not mean, however, that by October 2,2003 it was reasonably clear that Zurich should tender its policy limits to AIGDC, GAF’s excess insurer. While it was plain by then that Zalewski and DLS would be found negligent (Zalewski for his own negligence and DLS, as his employer, for its vicarious responsibility for his negligence), it had not yet been ascertained whether Zurich was the only primary insurer providing coverage for Zalewski’s and DLS’s negligence. It was certainly reasonable for Zurich to seek to determine whether Zalewski and DLS had their own primary coverage, apart from the coverage GAF provided to them through its policy as additional insureds, and Zurich had retained coverage counsel in part to make this determination. While one woúld think that this question of coverage could have been resolved sooner, since Zurich was providing a defense for both Zalewski and DLS that was contingent upon their continued reasonable cooperation with Zurich, it was only on November 13, 2003 that Zurich obtained information on which it reasonably could rely— Crawford’s transmittal letter reporting a conversation with DLS’s attorney who stated that, because of an error by DLS’s insurance agency, it had no primary coverage apart from Zurich’s.
Once Zurich had this information and reviewed the case evaluation it had sought from GAF’s defense counsel, it should have been clear by mid-November2003 that:
Zurich was the only primary insurer for the two defendants who certainly would be found liable— DLS and Zalewski;
Zurich was the only primary insurer for another defendant, GAF;
Penske may have had another primary insurer apart from Zurich, but it was not reasonably likely to be found liable. While Penske may have been negligent in failing to maintain the brakes of Zalewski’s tractor-trailer, there was no evidence that any deficiency in the brakes caused the accident. In addition, while Penske’s ownership of the truck provided prima facie evidence under G.L.c. 231, §85A that Penske was legally responsible for Zalewski’s conduct, which would have been sufficient to defeat a motion for summary judgment or directed verdict, the evidence would not likely have been strong enough to win at trial, since Penske simply leased the truck to GAF, who retained DLS to drive it.
Professional Tree Service, a third-party defendant, may have been liable for failing to post proper warning signs and its alleged negligence may have caused the accident, but its liability was less than reasonably certain. At that time, it was not clear how much insurance coverage Professional Tree Service had, but Zurich could quickly have determined that it held $1 million in primary coverage.
On November 19, 2003, Fuell, Zurich’s Complex Director in the case, declared at the conference call with defense counsel and AIGDC’s Satriano that she did not have the authority herself to tender the $2 million policy *153 limits but she was going to seek that authority. While Fuell did not orally inform Satriano at AIGDC that she had obtained the necessary authority and was tendering the full policy limits until her telephone call of January 23, 2004, it is plain that AIGDC understood from the time of the November 19, 2003 conference call that Zurich was going to tender its policy limits and acted accordingly. At the meeting, Satriano asked for all relevant documents so that he could become fully informed regarding the claim and evaluate the $5 million settlement offer recommended by GAF’s attorney. He also declared his intention to add an attorney representing AIGDC’s interests to the GAF defense team in the litigation.
The Rhodeses contend that Zurich’s delay in tendering its policy limits violated its statutory obligation to “effectuate prompt . . . settlements of claims in which liability has become reasonably clear.” G.L.c. 176D, §3(9)(f). Before considering what “prompt” means under this statute, this Court needs first to determine when Zurich actually tendered its policy limits. As noted earlier, Fuell verbally tendered to AIGDC the full policy limits in her telephone call to Satriano on January 23, 2004, but Satriano rejected the tender on two grounds: (1) he wanted it in writing: and (2) he wanted the writing to address whether Zurich was also tendering its defense obligation. It was the latter ground that delayed the written confirmation of Zurich’s tender, since Fuell needed to determine from the policy language whether Zurich was going to continue to pay for the defense of the case. On February 13, 2004, she provided Satriano with written email confirmation that Zurich had tendered its policy limits and that AIGDC can rely upon that tender in making a settlement offer to the Rhodes, but the email also indicated that Fuell had not resolved whether the tender meant that Zurich no longer intended to pay for the insureds’ defense of the case. Fuell did not send the formal letter of tender until March 29,2004 and AIGDC rejected the tender because it disclaimed any continued obligation to pay for defense costs. Although this Court is not aware of any written correspondence from AIGDC accepting Zurich’s tender after Zurich agreed on April 2, 2004 to continue to pay all defense costs, it is plain that AIGDC’s acceptance of the tender commenced upon its receipt of Zurich’s April 2 letter.
This Court finds that, for all practical purposes regarding settlement of a civil action, Zurich effectively tendered its policy limits to AIGDC on January 23, 2004 with Fuell’s verbal tender. From that telephone call, AIGDC knew that it effectively had Zurich’s $2 million policy limits in its pocket to include in any settlement offer and that, from that moment, the obligation to make a settlement offer had shifted to AIGDC. It was reasonable for AIGDC to insist that Zurich clarify whether it was seeking also to tender the defense obligation to AIGDC but AIGDC could not reasonably reject Zurich’s tender of policy limits because of that ambiguity. If it could, the insurers’ settlement obligation could stagnate in legal limbo, with the primary insurer trying to tender policy limits and the excess insurer rejecting the tender, leaving no insurer to make a reasonable settlement offer to the plaintiffs. Rather, AIGDC was obliged to accept the tender of policy limits and resolve separately the question of which insurer now had the obligation to pay defense costs. As noted earlier, if one looks at what AIGDC did rather than what it said, it is clear that it had accepted the tender of policy limits well before Zurich agreed to continue to pay defense costs on April 2, 2004, because it did not even invite Zurich to the meeting at GAF headquarters on March 4, 2004 to discuss legal strategy and settlement offers.
The question then is whether Zurich’s tender on January 23, 2004 was “prompt” within the meaning of G.L.c. 176D, §3(9)(f). To be sure, Zurich had effectively completed its due diligence by the November 19, 2003 meeting and Fuell knew then that she was going to recommend that Zurich tender its full limits. However, in order to obtain authority for so large a tender, Fuell had to prepare a detailed BI Claim Report, which she did not complete until December 19,2003. That Report then had to be reviewed by the approving officer and authorization given, which did not happen until January 22, 2004, in part because the person to whom the Report was addressed left Zurich at the end of December 2003.
This Court notes that, in. Hopkins, the Supreme Judicial Court effectively defined “prompt” to mean 30 days after the plaintiff on December 29, 1994 had sent the Chapter 93A letter demanding a settlement offer as required by G.L.c. 176D, §3(9)(f), even though the plaintiff had on October 14, 1994 sent a settlement demand letter and liability was reasonably clear by the end of October 1994. 434 Mass. at 559-60, 568. See G.L.c. 93A, §9(3) (requiring a plaintiff to make a written demand for relief at least 30 days before filing a Chapter 93A action). Here, Rhodes’s attorney chose not to characterize their settlement demand on August 13,2003 as a demand for a settlement offer under G.L.c. 176D, §3(9) (f); indeed, no settlement offer was demanded under Chapter 93A until after the jury’s verdict. Therefore, Fuell was under no statutory deadline when she sought approval of the tender and, as a result, Zurich lacked the urgency that would have been stimulated by such a deadline.
To be sure, an insurer may breach its obligation to effectuate a prompt settlement of a claim without a Chapter 93A demand letter, but the absence of such a demand may affect the determination of whether the obligation of promptness was breached. For all practical purposes, the meaning of “prompt” must be understood in its context, since the failure to be “prompt” under G.L.c. 176D, §3(9)(f) is itself an unfair act in violation of Chapter 93A. Viewed in that context, this Court does not find that Zurich’s delay from November 19, 2003 to January 23, 2004 violated its obligation to make a “prompt” tender. It is reasonable for an insurance company to require a tender as large as $2 million to be authorized at a high level in the company and it is equally *154 reasonable to require that such a request be accompanied by a detailed written justification such as the BI Claim Report. It is reasonable to expect that such a written justification will require a significant amount of time to prepare and for the authorizing officer to consider, and it is reasonable to expect that the time needed will be greater when this work is being performed during the busy holiday season between Thanksgiving and New Year’s Day. While this Court has no doubt that Zurich could have and should have provided the required authorization for the tender earlier than January 22, 2004, it does not find it to be an unfair act to have failed to do so. Therefore, this Court finds that Zurich acted with the promptness required under G.L.c. 176D, §3(9)(f) when it provided AIGDC with its verbal tender of policy limits on January 23, 2004.
This Court further finds that, even if Zurich had violated its duty to provide a prompt tender and was obliged to have furnished it within days of the November 19, 2003 conference call, the earlier tender would not in any way have affected either the timing or the amount of AIGDC’s subsequent settlement offer. There is literally nothing that AIGDC would have done differently had Zurich’s formal tender been provided during the November 19, 2003 conference call. By the end of that conference call, Satriano understood that he was going to obtain Zurich’s full $2 million tender, gathered all the documents he needed to take over the case, and announced his intention to bring in associate counsel. This Court recognizes that AIGDC had no “reason to examine or determine the extent of its liability” until Zurich, the primary insurer, “was prepared to address the possibility that the [plaintiffs] were entitled to its policy limits,” Clegg, 424 Mass. at 421-22 n.8, but AIGDC certainly understood from the November 19 conference call that it needed urgently to determine the reasonable extent of its liability. This Court also recognizes that AIGDC, as the excess insurer, had “no obligation or incentive to make an explicit commitment until the primary insurer has acted,” id. at 422 n.8, and that Zurich did not furnish its authorized tender until January 23, 2004. AIGDC, however, after it received Zurich’s tender, saw no urgency to make a settlement offer, and ultimately decided not to make a settlement offer until the mediation in August 2004. This Court is certain, based on the strategic posture AIGDC took in this action, that AIGDC would not have made a settlement offer prior to the mediation even if Zurich had made its tender on November 19 itself.[11]
Therefore, this Court finds that Zurich did not violate its obligation under G.L.c. 176D, §3(9) to make a prompt tender of its full policy limits and, if it did, its delay did not cause the Rhodeses to suffer any injury or loss because the delay did not affect either the amount or timing of AIGDC’s settlement offers. As a result, judgment shall enter for Zurich in this action.
Did AIGDC Breach Its Obligations as an Excess Insurer under G.L.c. 176D, §3(9)(f)?
Before the November 19,2003 conference call, as this Court earlier noted, AIGDC had no duty to “examine or determine the extent of its liability” because Zurich, the primary insurer, had not yet indicated that it was prepared to tender its policy limits. See Clegg, 424 Mass. at 421-22 n.8. Despite the absence of such a duty, AIGDC had recognized shortly after it received notice of the claim that, in view of the catastrophic injuries suffered by Ms. Rhodes, the tender would likely occur and AIGDC would then assume responsibility for the claim. Cognizant of that likelihood, it monitored the claim and reviewed the transmittals it received from Crawford.
Once Fuell informed Satriano during that November 19, 2003 conference call that she intended to seek Zurich’s authorization to tender the policy limits, AIGDC was placed on notice that the tender was imminent and that it would soon assume responsibility for the Rhodeses’ claim. Satriano acted appropriately during the conference call by asking for all the relevant documents regarding the claim so that he could knowledgeably examine the extent of AIGDC’s liability regarding this claim. He also acted appropriately in retaining Conroy as associate counsel to ensure that there was an attorney on the GAF defense team whose judgment he respected and who would reliably protect AIGDC’s interest in the litigation.
As earlier noted, until Satriano obtained Zurich’s verbal tender on January 23, 2004, AIGDC, as the excess insurer, had no duty to make any settlement offer to the Rhodeses. Id. However, once that tender was made, AIGDC assumed responsibility for and control over the Rhodes claim, including the responsibility to make a prompt and fair settlement offer.
The evaluation regarding a fair settlement offer that AIGDC, as the excess insurer, needed to make was somewhat different from the evaluation of Zurich, the primary insurer. Since its policy limits were $2 million, Zurich simply needed to make four determinations:
1. Was it reasonably clear that at least one of its insureds would be found liable?
2. Did any of its insureds have other primary insurance that covered this loss?
3. How much, if any, could the third-party defendant, Professional Tree Service, or its insurer be expected to contribute towards any settlement?
4. Was it reasonably clear that the damages suffered by Ms. Rhodes, her husband, and her daughter exceeded the $2 million policy limits, plus any reasonably expected contribution from Professional Tree Service or its insurer?
At the time Fuell made these determinations, it was nearly certain that Zalewski and DLS would be found negligent, and there was no evidence that these additional insureds had any other primary insurance. Fuell recognized that Professional Tree Service could *155 be found liable for failing to provide adequate signage and, at the time, believed that it held $3 million in liability insurance (in fact, it held only $1 million in liability insurance). Fuell had no difficulty finding that, even with a reasonable contribution from Professional Tree Service, the Rhodes’s reasonably clear damages far exceeded Zurich’s $2 million policy limits.
AIGDC, as the excess insurer, also needed to make four determinations regarding a fair settlement offer, but they differed slightly from Zurich’s determinations:
1. Was it reasonably clear that at least one of its insureds would be found liable?
2. Did any of its insureds have other primary or excess insurance that covered this loss?
3. How much, if any, could the third-party defendant, Professional Tree Service, or its insurer be expected to contribute towards any settlement?
4. What amount of damages was relatively clear?
By the time Zurich verbally tendered its limits on January 23, 2004, AIGDC had more than two months to evaluate the case. By this time, AIGDC should have known that no IME had yet been requested of Ms. Rhodes and that neither Ms. Rhodes nor Rebecca Rhodes had yet been deposed. Discovery in the case had closed on September 30,2003, but Pritzker earlier had orally agreed with GAF’s attorney to make Ms. Rhodes and Rebecca Rhodes available for deposition after the discovery deadline if the defendants insisted upon their being deposed. This Court finds (as did the Rhodeses’ expert at trial) that, as part of AIGDC’s due diligence in determining whether damages were reasonably clear, it was appropriate for AIGDC to insist that Ms. Rhodes submit to an IME and that Ms. Rhodes and Rebecca Rhodes be deposed. An excess insurer, until the primary insurer tenders its policy limits, does not have the authority to influence the strategic decisions regarding discovery made by the insured’s defense counsel. Therefore, upon Zurich’s tender, it was appropriate for AIGDC to revisit those decisions and determine whether there was additional discovery that it believed necessary to determine whether liability (here, the extent of damages) were reasonable clear. However, AIGDC could not delay its arrangements for the IME or these depositions in order to delay its obligation to make a prompt settlement offer, especially since discovery in the case had closed and it was scheduled for trial in September 2004.
It appears that AIGDC had determined, at least by the March 4, 2004 meeting at GAF’s headquarters, that it wished an IME, because Conroy before the meeting had looked for and found a physiatrist to conduct that IME. Yet, AIGDC demonstrated no apparent urgency to schedule the IME; it was not conducted until July 20, 2004, nearly the latest possible time for the IME to be conducted and for defense counsel to have the benefit of the IME report before the mediation on August 11. It is equally clear that AIGDC had not determined by that meeting that the depositions of Ms. Rhodes and Rebecca Rhodes were necessary to determine whether damages were relatively clear because, although the matter was discussed, no decision was made at that meeting as to whether to depose them. The fact that AIGDC did not know whether it wished to depose these two parties even though more than three months had passed since it knew it would assume responsibility for this catastrophic claim demonstrates that AIGDC did not believe that their depositions were necessary to determine whether liability was reasonably clear. Rather, the reason to depose them was simply to gauge how credible they would be at trial, and this reason was offset by the fear that deposing them would harden the plaintiffs’ already tough position as to settlement. Indeed, AIGDC proceeded to mediation without having ever deposed Rebecca Rhodes.
AIGDC also insisted that its attorneys seek discovery of Ms. Rhodes’s psychological records, which AIGDC argued was imperative before it could determine whether liability was relatively clear. This Court disagrees. G.L.c. 176D, §3(9) provides that a settlement offer need not be made until liability becomes “reasonably clear," it does not permit a settlement offer to be postponed until everything that may be relevant to damages has been uncovered. If a settlement offer is allowed to await the completion of any possible discovery that may be admissible at trial on the issue of damages based on the premise that liability is not reasonably clear until every bit of possible evidence has been located and scrutinized, then the obligation to give a prompt settlement offer would be rendered toothless. It was reasonably clear that Ms. Rhodes had been permanently rendered a paraplegic by the accident, that her life had been forever transformed, and that she was often depressed by how limited her life had become. While it may be relevant at trial that she had previously been treated by a psychologist for depression, such information could not materially change the extent of the pain and suffering arising from the accident.
The fact of the matter is that AIGDC did not delay its settlement offer in order to conduct the IME or to depose Ms. Rhodes or to obtain Ms. Rhodes’s psychological records; it delayed its settlement offer because it did not want to make any offer until mediation and it wanted, for strategic purposes, to wait until nearly the eve of trial to mediate the case. As a result, AIGDC did not make any settlement offer in this case until the mediation on August 11,2004, almost exactly one year from the date that the Rhodeses made their settlement demand. The issue, then, is whether delaying the settlement offer this long satisfied AIGDC’s duty under G.L.c. 176D, §3(9) to make a“prompt” settlement offer.
This Court finds that liability, including the extent of damages, in this case was reasonably clear by December 5, 2003, when the final version of the defense life care plan had been prepared by Mattson. By then, discovery had closed, all medical records had *156 been produced, the plaintiffs had presented their detailed settlement demand, and the defense had their own life care plan to compare with that presented by the Rhodeses’ life care plan expert. To be sure, more would be learned after that date regarding the progress of Ms. Rhodes’s recovery, but that is always the case in a catastrophic injury that does not result in death. If an insurance company is entitled to find that liability is not reasonably clear until an end point has been reached regarding the defendant’s recovery, then the obligation to make a prompt settlement offer would have no practical consequence in a catastrophic injury case because that end point is rarely reached before trial (unless the defendant dies before trial).[12] Therefore, liability was reasonably clear when Zurich tendered its policy limits to AIGDC on January 23, 2004. As noted earlier, this Court would permit AIGDC to delay its settlement offer if, upon tender, it believed in good faith that an IME and the deposition of all plaintiffs was necessary for liability to be reasonably clear, but only if AIGDC made best efforts to ensure that this additional discovery was completed promptly. As also noted, it is plain that AIGDC made no such effort.
AIGDC, however, contends that the time was not yet ripe to make a settlement offer because there remained coverage issues that had yet to be resolved, including the extent of Professional Tree Service’s policy limits. Pragmatically, it should not have taken long for AIGDC to ascertain from Professional Tree Service that its policy limits were only $ 1 million rather than the $3 million that Zurich understood. This Court finds that, while it was reasonable for AIGDC to examine these coverage issues before making a settlement offer, these efforts, too, need to be made with reasonable promptness, given that discovery had closed and that a substantial amount of time had passed since the plaintiffs’ settlement offer. This Court finds that AIGDC made no reasonable effort to resolve promptly the outstanding coverage issues.
This Court concludes that, even allowing a generous amount of time for AIGDC to become familiar with the claim, to obtain additional discovery it thought necessary to make liability reasonably clear, to resolve coverage issues, and to obtain internal approval within AIGDC, AIGDC violated its duly to make a prompt settlement offer once liability was reasonably clear by failing to make a settlement offer by May 1, 2004. May 1 was roughly eight months after the plaintiffs’ settlement demand, seven months after discovery had closed, more than five months after AIGDC knew that Zurich was to tender its policy limits, more than three months after Zurich’s verbal tender of limits, two months after the meeting at GAF headquarters where GAF pressed for a settlement offer, one and a half months after GAF’s coverage attorney warned AIGDC that its failure to commence settlement negotiations constituted a breach of its obligations under G.L.c. 176D, §3(9), one month after the formal written tender and the pretrial conference, and a few weeks after Pritzker agreed to mediation based only on Zurich’s settlement offer of policy limits.
AIGDC’s delay in making a prompt settlement offer cannot be justified' by the magnitude of plaintiffs’ settlement demand, which at that time was $19.5 million. “An insurer’s statutory duty to make a prompt and fair settlement offer does not depend on the willingness of a claimant to accept such an offer.” Hopkins, 434 Mass. at 567. Nor can it be justified by Pritzker’s supposed demand for a $5 million offer before entering into mediation. Not only did Pritzker never make such a demand, but AIGDC never even explored with Pritzker whether he would enter into mediation prior to a settlement demand, which he effectively did based upon Zurich’s tender to him of its settlement limits. An insurer may delay its settlement offer until mediation only if it promptly arranges for mediation, so that the settlement offer made during mediation satisfies its obligation of promptness.
Having found that AIGDC breached its duty to make a prompt settlement offer once liability was reasonably clear, this Court now turns to the question of whether the settlement offer it ultimately made at mediation— $3.5 million — was a reasonable settlement offer to effectuate a fair settlement. This Court finds it was at the low end of the reasonable range of settlement offers.
AIGDC’s Kelly provided Nitti with settlement authorily to offer $3.75 million, which included Zurich’s $2 million and assumed that Professional Tree Service would offer its policy limits of $1 million. This Court finds the latter assumption reasonable, even though Professional Tree Service ultimately settled for only $550,000. While Professional Tree certainly had a triable case as to liability, in sharp contrast with Zalewski, DLS, and (with the amendment adding the claim under the federal motor carrier statute) GAF, it faced the likelihood of a judgment well above policy limits if it were found liable. AIGDC reasonably expected that Professional Tree Service, to avoid that possibility, would have pressured its insurer to furnish its policy limits if it needed to do so to settle the action.
Nitti only offered $3.5 million of that $3.75 million in authorily, and this Court must evaluate the reasonableness of the offer in light of the amount actually offered, not the amount authorized to be offered. “The statute [G.L.c. 176D, §3(9)] does not call for [a] defendant’s final offer, but only one within the scope of reasonableness.” Bobick v. United States Fid. & Guar. Co., 439 Mass. 652, 662 (2003), quoting Forcucci v. United States Fid. & Guar. Co., 11 F.3d 1, 2 (1st Cir.1993).
In determining the reasonableness of that offer, this Court is mindful that it is truly determining whether the offer was so low that it constituted an unfair act under Chapter 93A. That is a difficult task when, as here, most of the damages are intangible, compensating Ms. Rhodes for her pain and suffering and her husband and daughter for their loss of consortium. In conducting this analysis, this Court must look to all *157 the circumstances, including the reasonableness of the offer in relation to the injuries suffered by the plaintiffs and the reasonableness of the plaintiffs’ demand. See Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 799-801 (1976) (settlement offer must consider injuries actually suffered by plaintiffs); Bobick, 439 Mass. at 662 (“excessive demands on the part of a claimant. .. may be considered as part of the over-all circumstances affecting the amount that would qualify as a reasonable offer in response”). See also Clegg, 424 Mass. at 420 (“Our standard for examining the adequacy of an insurer’s response to a demand for relief under G.L.c. 93A, §9(3), is ‘whether, in the circumstances, and in light of the complainant’s demands, the offer is reasonable’ ”), quoting Calimlim v. Foreign Car Ctr., Inc., 392 Mass. 228, 234 (1984).
This Court examines the reasonableness of AIGDC’s final offer at mediation from two separate angles. First, the Court looks to the amount of special damages that would clearly be established at trial even if the juiy credited the defense experts rather than the plaintiffs’ experts. At the time of the mediation, relying on the outdated calculation of past medical expenses set forth in Rhodes’s August 13, 2003 settlement demand, Ms. Rhodes had incurred at least $413,977.68 in medical bills. The defense life care planner’s final estimate of the cost of Ms. Rhodes’s life care plan was $1,239,763. The defense had not challenged the settlement demand’s estimate of $292,379 for the loss in household services or the out-of-pocket expenses incurred of $83,984. Therefore, if the case had proceeded to trial as planned in September 2004, the defense could not reasonably have disputed that Ms. Rhodes’s special damages were at least $2.03 million. AIGDC appears to have come to the same conclusion; AIGDC’s Kelly, who set the offer, estimated the special damages to be $2 million. If the juiy awarded only those special damages and did not pay a penny for pain and suffering or loss of consortium, those special damages alone, with common interest of 12 percent per annum from July 12, 2002 (the date the complaint was filed), would have yielded a verdict of roughly $2.56 million. For that judgment to have reached the settlement offer of $4.5 million (including the $1 million anticipated contribution from Professional Tree Service), the juiy would have had to award damages for pain and suffering and loss of consortium of roughly $1.54 million (which, with interest, would total $1.94 million).
This Court then asks whether, if the jury had awarded the plaintiffs at trial $1.54 million in pain and suffering and loss of consortium damages, the trial judge would likely have found that award to be so unreasonably low that the plaintiffs were entitled to additur. While such an award would certainly be stingy, even in a county like Norfolk County which is generally viewed as a favorable venue by defense counsel, this Court cannot say with confidence that a motion for additur in those circumstances would be more likely than not to prevail. Since this Court cannot conclude that such a verdict would be found so unreasonably low as to demand an ad-ditur, this Court cannot conclude that a settlement offer of this amount is so low as to be unreasonable.
Alternatively, this Court considers the evidence offered by the insurance experts at trial who testified as to whether this offer fell within the reasonable range of settlement offers. This Court concurs with the defense expert, former Superior Court Judge Owen Todd, who testified that the AIGDC’s settlement offer of $3.5 million was within the reasonable range, albeit at the low end of that range. In adopting his opinion, this Court considered the entirety of the circumstances, including the plaintiffs’ unreasonably high settlement demands, the fact that a life care plan may be purchased at less net cost through a structured settlement with an annuity, and the historically low juiy awards in Norfolk County.[13]
The issue the Court must now confront is whether AIGDC’s breach of its duly to provide a prompt settlement offer by failing to make any settlement offer until August 11, 2004 caused the plaintiffs to suffer any damages. It is plain to this Court that the delay did not cause the plaintiffs any actual compensable damages. Mr. Rhodes testified that he and his family would not have accepted any offer less than $8 million, which is more than the $6 million their own expert opined would have constituted the low range of a reasonable offer. Therefore, this Court is certain that, had AIGDC made a prompt reasonable settlement offer on or before May 1, 2004, even an offer that their own expert testified would have been reasonable, the Rhodeses would have rejected that offer. While all three members of the Rhodes family testified to the emotional distress they suffered from the prolonged litigation and Mr. and Ms. Rhodes testified to their anger at the defendants for failing to make a timely, reasonable offer, it is plain to this Court that their emotional distress would not have materially diminished had the defendants earlier made a settlement offer that their attorney would promptly have rejected. Nor would the costs they incurred from the litigation have been diminished if an earlier offer had been presented and turned down. Nor would the financial problems that the Rhodes family suffered from their savings having been depleted to pay the substantial costs of renovating their home to accommodate Ms. Rhodes’s paraplegia and to pay the costs of the litigation in any way have been lessened from an earlier settlement offer that they would have rejected. In short, all of these problems — the emotional distress arising from the frustrations of litigation, the substantial costs of litigation, even in a contingent fee case, and the fear of financial ruin — arose from the fact that the minimum settlement they were prepared to accept was well above the settlement that the defendants were prepared to offer or were required by Chapter 176D to offer.
The plaintiffs respond that they need not prove that they would have accepted the settlement offer to prove that the failure to make a prompt settlement offer *158 caused them damages, citing Hopkins. In Hopkins, the Supreme Judicial Court declared:
The defendant argues that the judge erred in concluding that the plaintiff met her burden of proving that its unlawful conduct caused her to sustain any damages. The defendant points to the absence of any testimony or evidence from the plaintiff that she would have accepted an offer of $400,000 in January 1995, combined with her rejection of subsequent offers in the same amount. These events, the defendant argues, demonstrate that there is “no causal nexus between [the defendant’s] failure to make the $400,000 offer in January of 1995 and any interest which may have been lost as a result of that failure.” The defendant concludes that, “[without such a nexus, [the plaintiff] may only recover (at most) nominal damages.” We disagree.
General Laws c. 176D, §3(9)(f), and G.L.c. 93A, §9, together require an insurer such as the defendant promptly to put a fair and reasonable offer on the table when liability and damages become clear, either within the thirty-day period set forth in G.L.c. 93A, §9(3), or as soon thereafter as liability and damages make themselves apparent. The defendant concedes on appeal that its failure to effectuate a prompt and fair settlement of the plaintiffs claim violated G.L.c. 176D, §3(9)(f). The defendant’s violation caused injury to the plaintiff, see Leardi v. Brown, 394 Mass. 151, 159 (1985), quoting Restatement (Second) of Torts §7 (1965) (injury in context of consumer protection legislation, such as G.L.c. 93A, is the “invasion of any legally protected interest of another”), and, under G.L.c. 93A, §9, the plaintiff is “entitled to recover for all losses which were the foreseeable consequences of the defendant’s unfair or deceptive act or practice.” DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 101 (1983).
We reject the defendant’s contention that the plaintiff has not shown that she was adversely affected or injured by its conduct. The defendant’s deliberate failure to take steps, as required by law, to effectuate a prompt and fair settlement in January 1995, when the liability of its insureds was clear, forced the plaintiff to institute litigation, and, in so doing, to incur the inevitable “costs and frustrations that are encountered when litigation must be instituted and no settlement is reached.” Clegg v. Butler, 424 Mass. 413, 419 (1997). An insurer’s statutory duty to make a prompt and fair settlement offer does not depend on the willingness of a claimant to accept such an offer. See Metropolitan Prop. & Cas. Ins. Co. v. Choukas, 47 Mass.App.Ct. 196, 200 (1999). Accordingly, quantifying the damages for the injury incurred by the plaintiff as a result of the defendant’s failure under G.L.c. 176D, §3(9)(f], does not turn on whether the plaintiff can show that she would have taken advantage of an earlier settlement opportuniiy. The so-called causation factor entitles a plaintiff, like the plaintiff here, to recover interest on the loss of use of money that should have been, but was not, offered in accordance with G.L.c. 176D, §3(9)(f), if that sum is in fact included in the sum finally paid to the plaintiff by the insurer. It is this amount of money that has been wrongfully withheld from the plaintiff, and it is this sum on which the defendant must pay interest to remedy its wrongdoing. “This is precisely the type of damage we have described as appropriate! ] ... in an action . . . under [G.L.] c. 93A.” Clegg v. Butler, supra, quoting Schwartz v. Rose, 418 Mass. 41, 48 (1994).
“The statutes at issue were enacted to encourage settlement of insurance claims . . . and discourage insurers from forcing claimants into unnecessary litigation to obtain relief’ (citation omitted). Clegg v. Butler, supra An insurer should not be permitted to benefit from its own bad faith, where, as occurred here, it violated G.L.c. 176D, §3(9)(f), by intentionally failing to make a prompt, fair offer of settlement. The defendant could have avoided the imposition of damages by making a prompt and fair offer of settlement that complied with G.L.c. 176D, §3(9)(f), within thirty days of receiving the plaintiffs G.L.c. 93A demand letter, as provided by G.L.c. 93A, §9(3) (“[a]ny person receiving [a written demand for relief] who, within thirty days . . . makes a written tender of settlement which is rejected by the claimant may, in any subsequent action, file the written tender and an affidavit concerning its rejection and thereby limit any recovery to the relief tendered if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner”). Had such an offer been made, and rejected by the plaintiff, the burden would have been on the defendant to prove that the offer was reasonable. See Kohl v. Silver Lake Motors, Inc., 369 Mass. 795, 799 (1976). In circumstances such as this, when the defendant failed to make any offer at all, the plaintiff should not be required to show that she would have accepted a hypothetical settlement offer, had one been forthcoming. See Metropolitan Prop. & Cos. Ins. Co. v. Choukas, supra at 200. We considered a similar argument when deciding the Clegg case and rejected it. See Clegg v. Butler, supra at 428-429 (O’Connor, J., dissenting) (arguing that actual damages had not been proved, because, even though primary insurer [defendant] had unlawfully failed to offer prompt and fair settlement, plaintiffs had not shown that excess insurer subsequently would have made offer that was acceptable to them).
We reject the defendant’s contention that the plaintiff has not shown that she was adversely affected or injured by its conduct. The defendant’s deliberate failure to take steps, as required by law, to effectuate a prompt and fair settlement in January 1995, when the liability of its insureds was clear, forced the plaintiff to institute litigation, and, in so doing, to incur the inevitable costs and frustrations *159 that are encountered when litigation must be instituted and no settlement is reached.
Hopkins, 434 Mass. at 565-69 (footnotes omitted).
While one can certainly see why the plaintiffs claim that Hopkins is determinative, this Court finds that it is not, for two reasons. First, the facts in Hopkins were materially different from those in the instant case. The Supreme Judicial Court in Hopkins, on those facts, appears to have found that the insurer’s conduct caused actual damages because the Court recognized what it characterized as “the obvious rule that, in order to recover actual damages under G.L.c. 93A, §9, there must be a causal relationship between the alleged act and the claimed loss.” Id. at. 567-68, n.17. In Hopkins, after having made her initial settlement offer but before filing suit, the plaintiff sent a Chapter 93A letter to the insurer demanding a settlement offer, and filed suit only after the insurer responded to that demand letter without making an offer of settlement. 434 Mass. at 559. When the insurer, belatedly but prior to trial, made a settlement offer of $400,000, the offer was accepted by the plaintiff. Id. 434 Mass. at 559-60. In finding that “(t]he defendant’s deliberate failure to take steps, as required by law, to effectuate a prompt and fair settlement in Januaiy 1995, when the liability of its insureds was clear, forced the plaintiff to institute litigation, and, in so doing, to incur the inevitable costs and frustrations that are encountered when litigation must be instituted and no settlement is reached,” id. at 567, quoting Clegg, 434 Mass. at 419, the Supreme Judicial Court appears to have found that, if this reasonable offer had been made within 30 days of the Chapter 93A letter, as required, the plaintiff would have settled the case without filing suit. That is why the costs of the litigation can be said to have been caused by the insurer’s failure to make a prompt settlement offer. That is also why the Court found that the plaintiff had suffered damages in the form of lost interest — if the settlement offer had been made promptly after receipt of the Chapter 93A demand letter, the plaintiff would have accepted the offer and enjoyed the use of the $400,000 promptly thereafter, rather than having to wait, as she did, until the eve of trial to have use of that $400,000. See Hopkins at 567 (interest was wrongfully withheld from plaintiff). Indeed, the Supreme Judicial Court expressly noted in Hopkins, ‘We need not decide in this case whether the same measure of damages would apply in a case where an insurer, having initially violated G.L.c. 176D, §3(9)(f), and G.L.c. 93A, §§2 and 9, thereafter makes a fair and reasonable (but nevertheless tardy) offer of settlement, which is refused by a claimant.” Id. at 567, n.16. The factual scenario expressly reserved by the Court in Hopkins is precisely the scenario presented to this Court.[14]
Second, to the extent that Hopkins can be understood to hold that a plaintiff is entitled to recover damages from an insurer for its failure to make a prompt settlement offer without proving that the plaintiff suffered any loss arising from that unfair act (because the plaintiff would have rejected the offer had it been timely made), Hopkins was effectively overruled by the Supreme Court’s subsequent decision in Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., 445 Mass. 790 (2006). As observed in note 11 supra, the Supreme Judicial Court in Hershenow held that, to establish liability in a Chapter 93A action, the plaintiff must not only prove an unfair and deceptive act or practice but must also prove that the unfair act or practice “caused a loss.” 445 Mass. at 798 (2006) . The Court made clear that there is no such thing as a “per se injury” under Chapter 93A; “a plaintiff seeking a remedy under G.L.c. 93A, §9, must demonstrate that even a per se deception caused a loss.” Id. Since there is a “required causal connection between the deceptive act and an adverse consequence or loss,” id. at 800, and since there can be no adverse consequence or loss from the failure of an insurer to make a prompt and reasonable settlement offer if the plaintiff would have rejected that offer, Hershenow, although not an insurance case, must stand for the proposition that a plaintiff, to prevail on a Chapter 93A/Chapter 176D claim, must prove not only that the insurer failed to make a prompt or reasonable settlement offer but also that, if it had, the plaintiff would have accepted that offer and settled the actual or threatened litigation.
The instant case illustrates how foolish it would be to interpret Hopkins as permitting a finding of actual damages for an insurer’s failure to make a prompt or reasonable settlement offer when the evidence decisively demonstrates that the plaintiff would not have accepted a reasonable settlement offer regardless of when it was offered. Under such an interpretation, the plaintiffs would be able to establish some actual damages even though they suffered none. Those modest actual damages , however, would be only the tip of the iceberg of what the insurer would be required to pay in the Chapter 93A action. In 1989, the Legislature amended G.L.c. 93A, §9(3) to add the italicized language quoted below:
[I]f the court finds for the petitioner, recovery shall be in the amount of actual damages or tweniy-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two... For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim
G.L.c. 93A, §9(3) (italics added). The Supreme Judicial Court and the Appeals Court have interpreted this amendment to mean that, if the plaintiff went to trial in the underlying case and obtained a judgment, and if the plaintiff proves some actual damages arising from the insurer’s violation of Chapter 176D and establishes that the violation was willful or knowing, the amount of *160 damages to be doubled or trebled is not the actual damages but the amount of the underlying judgment. See, e.g., Clegg v. Butler, 424 Mass. at 424; Kapp v. Arbella Mut Ins. Co., 426 Mass. 683, 685-86 (1998); Yeagle v. Aetna Cas. & Sur. Co., 42 Mass.App.Ct. 650, 655 (1997) (the 1989 amendment “threatened abad faith defendant with multiplication of the amount of the judgment secured by the plaintiff on his basic claim — a total that might be many times over the interest factor” and that “exceeded the injury caused by the c. 93A violation”). As the Supreme Court declared in Clegg:
The italicized portion of this statute was inserted by St. 1989, c. 580, §1, which was apparently enacted in response to cases such as Bertassi v. Allstate Ins. Co., 402 Mass. 366 (1988), Trempe v. Aetna Cas. & Sur. Co., 20 Mass.App.Ct. 448 (1985), and Wallace v. American Mfrs. Mut. Ins. Co., 22 Mass.App.Ct. 938 (1986), which limited those damages subject to multiplication under c. 93A to loss of use damages, measured by the interest lost on the amount the insurer wrongfully failed to provide the claimant... This amendment greatly increased the potential liability of an insurer who wilfully, knowingly or in bad faith engages in unfair business practices.
424 Mass. at 424. Therefore, in this case, if this Court, under Hopkins, were required to find that the plaintiffs suffered even nominal damages from being denied a prompt settlement offer that they certainly would have rejected, and if this Court were to find the violation willful or knowing (which it does)[15] the plaintiffs would be entitled to receive, not merely those nominal damages and the reasonable attorneys fees they incurred in prevailing upon their Chapter 93A/ 176D claim, but also double or triple the amount of the judgment they received in the underlying personal injury case — that is, $22.6 million or $33.9 million.
The Legislature made clear, however, that these extraordinarily punitive damages were limited to cases where there was, not only willful or knowing conduct, but also some actual damages. See Kapp, 426 Mass. at 685-86 (1998); Yeagle, 42 Mass.App.Ct. at 652-56. The Legislature could have declared that the underlying judgment should be treated as actual damages, but it did not; it required proof of actual damages and used the amount of the underlying judgment only to calculate punitive damages. See id.[16] Since the plaintiff would suffer actual damages from lost interest only if the plaintiff would have accepted the earlier, reasonable settlement offer, the Legislature effectively limited both actual and the far greater punitive damages to those cases that would have settled (or settled earlier) had the insurer performed its duty to provide a prompt and reasonable settlement offer. See Kapp, 426 Mass. at 686 (1989 amendment “was aimed at the situation where a defendant insurer, acting in bad faith, failed to settle a claim reasonably, obliging the plaintiff to litigate unnecessarily”). In those cases where the plaintiff would have rejected even a reasonable settlement offer, then the insurer’s failure to make a prompt and reasonable offer is not the reason why the case proceeded to trial.
To allow a plaintiff to obtain actual and punitive damages when it would not have settled the case even with a reasonable settlement offer would actually discourage plaintiffs to settle, which was the opposite of what the Legislature intended when it enacted the 1989 amendment. The Supreme Judicial Court in Clegg observed:
The multiple damages provided under c. 93A are punitive damages intended to penalize insurers who unreasonably and unfairly force claimants into litigation by wrongfully withholding insurance proceeds. As part of a statutory scheme meant to encourage out-of-court resolutions, the statute does not punish settling insurers by placing the entire settlement award at risk of multiplication.
424 Mass. at 425. Just as it takes “two to tango,” it also takes two to settle a case. The punitive damage provision is plainly meant to pressure insurers to make reasonable settlement offers, lest the plaintiff be forced into a trial that he otherwise would have settled. If the plaintiff, however, could win punitive damages regardless of whether he would have accepted a reasonable offer, then a smart plaintiff (or a plaintiff intelligently represented), once he recognized that the insurer had failed to make a prompt or reasonable offer, would choose not to settle the case and proceed to trial, even if the insurer later made a reasonable settlement offer, because the plaintiff could obtain punitive damages of double or treble the underlying judgment only if he proceeded to judgment and did not settle or arbitrate the case. See Clegg, 424 Mass. at 424-25 (punitive damages of double or treble the underlying judgment are available only when underlying case proceeds to judgment, not if it is resolved through settlement or arbitration).
Therefore, this Court finds that, since it is plain that the Rhodeses would not have settled this case before trial even if AIGDC had made a prompt and reasonable settlement offer (even the offer its own expert declared reasonable), the Rhodeses have failed to prove the required element of causation — that AIGDC’s failure to make a prompt settlement offer before trial caused them any actual damages. Since the Rhodeses have suffered no actual damages from AIGDC’s breach of G.L.c. 176D, §3(9)(f), they are not entitled to an award of either actual or punitive damages.
The final issue this Court must address is whether AIGDC breached its obligation to provide a reasonable settlement offer after trial. As noted earlier, the total amount due under the September 28, 2004judgment was roughly $11.3 million, and that amount was increasing at a rate of 12 percent per year as a result of post-judgment interest. An insurer’s duty to settle a case does not end with the judgment, unless the insurer promptly pays the judgment. When the insurer, as here, causes a notice of appeal to be filed, the insurer continues to have a duty to settle what is now the appellate *161 litigation. While the standard under G.L.c. 176D, §3(9) (f) remains the same after judgment — the insurer must still provide a prompt and fair offer of settlement once liability has become reasonably clear — the existence of the judgment should change the insurer’s evaluation of what constitutes a fair offer. Pragmatically, assuming the policy limits are sufficient, the insurer will be obliged to pay the judgment, with post-judgment interest, unless the insured defendant prevails in overturning the verdict on appeal. Therefore, the questions that need to be considered in evaluating the fairness of the insurer’s offer include:
What is the likelihood that the appeal will succeed?
If it does succeed, is the result likely to be a new trial, dismissal of the claim, or a reduction in the amount of the judgment?
If the appeal obtains a new trial, what is the likelihood that the defendant will prevail at this new trial? If the plaintiff were to prevail, what is the likelihood that the damages found by the jury will differ greatly from those found by the jury at the first trial?
If AIGDC asked itself these questions, which it should have, it would have been apparent that none of the answers bode well for AIGDC. The appeal rested on unusually feeble arguments — the trial court’s denial of the defendants’ motion for remittitur and its denial of the defendants’ motion for discovery of Ms. Rhodes’s psychological records. In light of Ms. Rhodes’s paraplegia and the extent to which it irrevocably diminished her life and that of her husband and daughter, the likelihood that an appellate court would find that the trial judge abused her discretion by denying the defendants’ motion for remittitur is microscopic. The likelihood that an appellate court would find that the trial judge abused her discretion by denying the defendants’ motions for disclosure of Ms. Rhodes’s psychological records is less fanciful than with the denial of the remittitur but reasonably should still be recognized as minimal. The defendants’ motion for disclosure of these records was filed long after discov-eiy had closed. For that reason alone, its denial was well within the discretion of the trial judge. Moreover, the plaintiffs argued that Ms. Rhodes intended to testify only to “garden variety” emotional distress, and did not intend to offer psychological testimony that the accident caused Ms. Rhodes to suffer from a psychiatric disorder. It was well within the Court’s discretion to deny the privileged records based on this representation. AIGDC, according to Nitti’s internal request for AIGDC approval to prosecute an appeal, apparently believed that Ms. Rhodes’s testimony at trial about her pre-existing bipolar disorder required disclosure of these records. It is not clear from this record whether defense counsel objected to this testimony or argued at trial that it opened the door to disclosure of her psychological records but, assuming the defendants preserved their rights on appeal, there is no reason to believe that this testimony unfairly prejudiced the juiy in any way that would have affected its verdict. Nitti acknowledged that this testimony was to her pre-ex-isting bipolar disorder; he does not contend that she testified that the accident caused her bipolar disorder.
Moreover, even if the Appeals Court were to have found that the trial judge abused her discretion by denying discovery of Ms. Rhodes’s psychological records, the best that AIGDC could do is obtain a new trial as to damages, since the AIGDC-insured defendants had already stipulated to liability. Apart from selecting a different jury, there was no reason for AIGDC to believe that a second trial would go any better for it than the first. However, what is certain is that the prejudgment interest on any verdict would be considerably greater. It would likely take at least two years for the appeals process to conclude and a new trial to be conducted, so the judgment would likely be increased by 50 percent to account for prejudgment interest rather than the roughly 25 percent increase for prejudgment interest in the original judgment.
In view of all these factors, AIGDC’s offer of $7.0 million on December 17, 2004 in response to the plaintiffs’ Chapter 93A demand letter, which included Zurich’s $2 million and was roughly 60 percent of the amount then owed under the judgment, was not only unreasonable, but insulting.[17] No reasonable insurer could have concluded that a 40 percent discount of the judgment was reasonable in view of AIGDC’s meager chance of prevailing on appeal. When one considers that AIGDC also required release of the plaintiffs’ claims under Chapters 93A and 176D, the offer becomes even more ridiculous. This Court finds that AIGDC did precisely what Chapter 176D was intended to prevent — attempt to bully the plaintiffs into accepting an unreasonably low settlement rather than wait the roughly two years for their appeal to conclude and the judgment to be paid. See R.W. Granger & Sons, Inc. v. J&S Insulation, Inc., 435 Mass. 66, 77 (2001) (G.L.c. 176D, §3(9)(g) “expresses a legislative purpose to penalize the practice of ‘low balling,’ i.e. offering much less than a case is worth in a situation where liability is either clear or highly likely”), quoting Guitg v. Commerce Ins. Co., 36 Mass.App.Ct. 339, 343 (1994).
In contrast with AIGDC’s failure before trial to provide a prompt offer of settlement, it is plain from the facts of this case that, if a reasonable offer of settlement had been made on December 17, 2004, it would have resulted in settlement of the case and the voluntary dismissal of the appeal because the case did settle in June 2005 once a reasonable settlement was proffered. At that time, AIGDC finally agreed to pay the Rhodeses $8,965 million, in three installments, not including the roughly $2.32 million that Zurich had already paid to the Rhodeses on December 22,2004 and not including any release of the plaintiffs’ right to file the instant lawsuit. Since a prompt, reasonable post-judgment offer would have resulted in a settlement, the plaintiffs are able to prove so-called “loss of use” damages *162 arising from AIGDC’s post-judgment breach of its obligation under G.L.c. 176D, §3(9)(g), that is, the interest the plaintiffs would have earned on this money had the settlement been reached in December 2004 rather than June 2005. See Hopkins, 434 Mass. at 567 (“The so-called causation factor entitles a plaintiff ... to recover interest on the loss of use of money that should have been, but was not, offered in accordance with G.L.c. 176D, §3(9)(f), if that sum is in fact included in the sum finally paid to the plaintiff by the insurer”). This Court finds that, if the reasonable offer ultimately made by AIGDC on or about June 2, 2005 had been made on December 17, 2004, it is more likely than not that a settlement would have been reached by January 2, 2005 rather than June 2, 2005, and the first of three installment payments would have been paid five months earlier — on February 5, 2005 rather than July 5. Measuring loss of use damages at the post-judgment rate of interest of one percent per month, AIGDC’s unreasonable delay in making a reasonable settlement offer cost the Rhodeses $448,250.[18]
This Court does not find that the plaintiffs, on this record, have established any damages beyond “loss of use” damages. There is not sufficient evidence of emotional distress arising from these unreasonably low post-judgment offers to award emotional distress damages. The Supreme Judicial Court requires that a plaintiff satisfy the elements of an intentional infliction of emotional distress claim in order to establish emotional distress damages in a Chapter 93A case. Haddad v. Gonzales 410 Mass. 855 (1991). This Court, while it finds AIGDC’s conduct to be knowing and willful, does not find it be “extreme and outrageous.” See id. at 871. Nor does this Court find the defendants’ emotional distress to be sufficiently “severe” during the post-judgment period to warrant damages, if only because Zurich’s payment of $2.32 million on December 22, 2004 alleviated the plaintiffs’ immediate financial distress. See id.
The Rhodeses argue that, when an insurer breaches its obligation to make a prompt and reasonable offer of settlement, the Supreme Judicial Court has suggested that a plaintiff is entitled to compensation for the “costs and frustrations that are encountered when litigation must be instituted and no settlement is reached.” Clegg, 424 Mass. at 419. See also Hopkins, 434 Mass. at 567 (insurer, by forcing the plaintiff to institute litigation, forced the plaintiffs “to incur the inevitable ‘costs and frustrations that are encountered when litigation must be instituted and no settlement is reached’ ”), quoting Clegg, 424 Mass. at 419. This Court agrees that the financial costs of litigation that the plaintiff was forced to incur by the insurer’s failure to comply with its obligations under G.L.c. 176D are compensable under Chapter 93A. However, the plaintiffs did not offer any evidence as to any costs of litigation the Rhodeses incurred after December 2004, so this Court will not award any damages for such costs. This Court does not agree that the emotional costs of litigation — the so-called “frustrations” of litigation — are compensable unless those frustrations rise to the level required for recovery of damages under an intentional infliction of emotional distress claim. While the Supreme Judicial Court in Clegg and Hopkins certainly acknowledged that litigation carries “frustrations" with it, the damages in both cases were limited to “loss of use” damages, not emotional distress damages. Clegg, 424 Mass. at 425; Hopkins, 434 Mass. at 560, 567.
This Court further finds that AIGDC’s $7.0 million settlement offer, including Zurich’s $2 million and including a release of the plaintiffs’ claims under Chapters 176D and 93A, made on December 17, 2004 and repeated in writing on March 18, 2005-, was not only unreasonably low but also constituted a willful and knowing violation of G.L.c. 176D, §3(9)(g). This Court finds that double, rather than treble, damages are appropriate here only because AIGDC later came to its senses and made a reasonable post-judgment offer before the appellate litigation began in earnest.
The final issue this Court needs to confront in this legal odyssey is whether the amount doubled is the actual damages or the amount of the judgment. This Court finds that the appropriate amount doubled is the actual damages . This Court understands why the Legislature in enacting the 1989 Amendment to G.L.c. 93A, §9(3) would wish to punish an insurer who, by its willful or knowing failure to make a prompt and fair settlement offer, forces a litigant to proceed to trial to obtain a reasonable judgment. In such cases, the Legislature authorized the doubling or trebling of the underlying judgment to deter insurers from engaging in such unfair conduct. However, when the insurer’s failure to make a prompt and fair settlement offer occurs after the issuance of the judgment, it makes no sense to multiply the judgment because the insurer’s conduct did not force the trial that yielded that judgment. It may arguably be appropriate to multiply the post-appeal judgment if the insurer’s failure to make a prompt and fair post-judgment settlement offer forces the litigant to litigate the full appellate process but that did not happen here — AIGDC made a fair settlement offer and the case settled before any appellate briefs were filed. Consequently, this post-judgment violation of Chapter 176D is comparable to-the pre-trial violation of Chapter 176D in which the insurer belatedly makes a fair settlement offer and the case settles before trial (albeit later than it should have). In such cases, the Supreme Judicial Court has declared that the 1989 Amendment to G.L.c. 93A, §9(3) does not apply, because it applies only to cases in which the insurer’s conduct forces the plaintiff to proceed to trial to obtain a judgment, not to cases resolved by settlement or arbitration. See Clegg, 424 Mass. 424-25.
Consequently, this Court finds that AIGDC is liable only for double the actual “loss of use” damages of $448,250, which totals $896,500, plus the Rhodeses’ reasonable attorneys fees and costs incurred in prosecuting this Chapter 93A action.
*163 ORDER
For the reasons detailed above, this Court ORDERS that:
1. This Court finds that Zurich did not violate its duty as the primary insurer under G.L.c. 176D, §3(9)(f) “to effectuate prompt, fair and equitable settlements of claims in which liabiliiy has become reasonably clear.” G.L.c. 176D, §3(9)(f). When final judgment ultimately enters in this case, judgment shall enter in favor of the defendant Zurich, with statutory costs only.
2. This Court finds that National Union and AIGDC, prior to the issuance of the final judgment, violated their duty as the excess insurer under G.L.c. 176D, §3(9){f) “to effectuate prompt... settlements of claims in which liabiliiy has become reasonably dear,” G.L.c. 176D, §3(9) (fl, but their violation did not cause the plaintiffs to suffer any actual damages.
3. This Court finds that National Union and AIGDC, after the issuance of the final judgment, violated their duty as the excess insurer under G.L.c. 176D, §3(9)(f) “to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear.” G.L.c. 176D, §3(9) (f). This Court finds that the actual damages caused by this violation are limited to “loss of use” damages in the amount of $448,250.
4. This Court finds that the violation found in paragraph 3 supra was willful and knowing, and that doubling the amount of actual damages is an appropriate punitive award for such violation. Therefore, this Court orders that National Union and AIGDC, jointly and severally, shall pay the plaintiffs $896,500 in actual and punitive damages.
5. This Court finds, under G.L.c. 93A, §9(4), that National Union and AIGDC shall also pay to the plaintiffs the reasonable attorneys fees and costs incurred in prosecuting this action against National Union and AIGDC. No later than June 27,2008, the plaintiffs shall serve their application for reasonable attorneys fees and costs, supported by appropriate affidavits and documentation. No later than July 25, 2008, National Union and AIGDC shall serve any opposition to the plaintiffs’ application, and the application and opposition will be filed forthwith. A hearing regarding the application for attorneys fees shall be conducted on July 30, 2008 at 2:00 p.m.[19]

 Since AIGDC served as National Union’s claims administrator and managed the Rhodeses’ excess insurance claim, this Court will simply refer to AIGDC when speaking of the excess insurer. There is no dispute that, if AIGDC is liable here, National Union is equally liable.

 Since AIGDC had earlier been notified of the claim and established a claim number, it received this transmittal: Zurich still had no claim number so this transmittal, too, was lost in its paperwork limbo.

 Chaney apparently mistakenly believed that Zalewski was employed by GAF; Zalewski was actually employed by DLS. GAF had retained DLS as an independent contractor to provide drivers for the trucks GAF leased from Penske.

 UnderG.L.c. 231, §85A, once the plaintiffs prove that the truck was registered in the name of Penske as owner at the time of the accident, it is “presumed” that the truck was “operated, maintained, controlled or used by and under the control of a person for whose conduct [Penske] was legally responsible, and absence of such responsibility shall be an affirmative defence to be set up in the answer and proved by the defendant.” G.L.c. 231, §85A. This means that ownership of the buck is prima facie evidence of control, sufficient to defeat any motion for summary judgment or directed verdict, but rebuttable with evidence to the contrary.

 Carlotta Patten, the Brown, Rudnick associate who handled various discovery matters for the Rhodes litigation, acknowledged that Rhodes’s April 2003 answers to interrogatories declared that her medical expenses exceeded $1 million. This figure was largely based on a tally provided by United Health Care, Rhodes’s health insurer. However, when Patten obtained the various certified medical bills later in the spring of 2003, she observed discrepancies between these bills and the United Health Care totals, which she later learned arose from widespread duplication that reduced by more than half the actual amount of medical expenses. Rhodes’s attorneys postponed completion of the written demand until they could resolve these discrepancies.

 The medical amounts were projected by Adele Pollard, a registered nurse with Case Management Associates, Inc, who first estimated Ms. Rhodes’s lifetime medical expenses assuming that she lived 34.7 more years (based on normal life expectancy) and then estimated those lifetime expenses assuming she lived only 24.4 more years (based on a lower than normal life expectancy arising from her injuries). The total relied upon was the average of these two estimates, reduced by present value calculations prepared by an economist.

 Satriano was the fifth claims director at AIGDC to take responsibility for this file, following four others who had responsibility for the file for roughly three months apiece.

 Mattson’s preliminaiy life care plan, issued on October 2, 2003, had estimated the total life care costs as $1,487,827.

 A similar motion had been filed on May 17, 2004 but it was withdrawn after GAF objected to the filing of that motion. GAF agreed to the filing of the motion only after Maturine warned GAF in writing that its continued denial of consent to its filing may constitute a breach of the insured’s obligation of cooperation and may result in AIGDC disclaiming coverage.

 The insurance company, despite the disputed evidence as to whether the plaintiff had been injured in the accident, still made a settlement offer of $20,000 in O'Leary-Alison. Id. at 216. Therefore, the Appeals Court essentially found that the insurance company’s offer was reasonable under the circumstances, since it did not need to consider whether the insurance company had an obligation to make an offer.

 The Rhodeses argue that, if they prove that Zurich failed to make a prompt tender of its policy limits, they are entitled to Chapter 93A damages even if they failed to prove that Zurich’s delay in furnishing its tender had any consequence on AIGDC’s settlement conduct, citing Clegg.
In Clegg, the primary insurer failed to respond to the plaintiffs’ various settlement offers, the earliest coming in September 1991, until July 1992, and that settlement offer, which was less than policy limits, was found to be unreasonably low because it was reasonably clear that damages well exceeded the policy limits. 424 Mass. at 414-23. The primary insurer only offered its policy limits at the mediation in May 1994, just before the scheduled trial, and the excess insurer quickly agreed to add $425,000, allowing the case to settle at or around mediation for $675,000. Id. at 416. The Supreme Judicial Court held that the plaintiffs were entitled to damages equal to “the interest lost on the money wrongfully withheld by the insurer.” Id. at 423. Justice O’Connor, in dissent, observed that the plaintiffs had failed to prove that they had been deprived of the use of *164 settlement money for any period of time because they would not have been paid the tender of policy limits to the excess insurer and there was no evidence that the excess insurer would have settled the case earlier than the mediation if the primary insurer had tendered earlier. Id. at 428-29 (Dissent, O’Connor, J.). The majority responded to Justice O’Connor’s dissent with two separate and distinct arguments. First, the Court essentially declared that the plaintiff was not required to prove that (he primary insurer’s delay in providing a full tender delayed the ultimate settlement of the case. The Court wrote:
If we were to follow the position taken by the dissent, when a primary insurer and an excess insurer both cover a claim, a primary insurer who subjects a party to improper delay would never be liable for the injuries caused by such ' behavior, because there would always be some uncertainly as to what the excess insurer would have done if the primary insurer had behaved differently. We do not believe such a result comports with the language or intent of G.L.c. 176D, §3(9), or G.L.c. 93A. The evidence regarding the excess insurer’s readiness to pay, both as to timing and amount, must necessarily be indirect and inferential in a case such as this, since the excess insurer has no obligation or incentive to make an explicit commitment until the primary insurer has acted. If, as the dissent suggests, such evidence is insufficient, the injured party would never be able to recover damages in respect to the delay in receiving payment from either the excess insurer ' or the primary insurer. Primary insurers cannot avoid liability for their unfair settlement practices under G.L.c. 176D, §3(9), by pointing to the uncertainty surrounding a claim against an excess insurer, when that uncertainty stems from the primary insurer’s own behavior and delay.
Id. at 422 n.8.
Second, the Court essentially declared that the trial judge had found that the primary insurer’s delay had caused the excess insurer to delay its final settlement offer, and thereby delayed the effectuation of the settlement. The Court noted, ‘The promptness of [the excess insurer’s] settlement also supports the judge’s inference that had [the primary insurer] offered its policy limits earlier, [the excess insurer] would have settled earlier too.” Id.
Therefore, it is not clear from Clegg whether the Supreme Judicial Court held that a plaintiff in a G.L.c. 176D action is entitled to the interest on the amount the primary insurer should have tendered from the date the tender should have occurred, even if there is no evidence that the plaintiff would have received the use of the tendered money if it had been timely tendered or whether it simply held that the trial judge had found that the excess insurer would have settled far earlier had the primary insurer promptly tendered, and that the primary insurer’s delay thereby caused the plaintiff the loss of use of the tendered money.
This Court need not resolve whether the former or the latter holding was intended by the Supreme Judicial Court in Clegg because the Supreme Judicial Court subsequently made it clear in Hershenow v. Enterprise Rent-A-Car Company of Boston, Inc., that, to establish liability in a Chapter 93A action, the plaintiff must not only prove an unfair and deceptive act or practice but must also prove that the unfair act or practice “caused a loss.” 445 Mass. 790, 798 (2006). Therefore, even if the Supreme Judicial Court intended the former holding in Clegg, it repudiated that holding in Hershenow, and required the plaintiff to prove its loss, not merely assume it. Hershenow at 801 -02 (finding that there is no per se injury under Chapter 93A).

 Indeed, because of a variety of complications that Ms. Rhodes suffered in 2003 as a result of the accident that left her bedridden until October 2003 (bed sores and a broken leg), Ms. Rhodes did not begin her rehabilitation until at or around the time of the mediation. Therefore, there was no possibility of any end result from that rehabilitation becoming known until long after the trial had ended. Moreover, as a result of those complications, Ms. Rhodes’s medical bills increased and, if anything, her long-term prognosis grew worse. Therefore, the passage of time in no way should have diminished AIGDC’s estimation of Ms. Rhodes’s damages.

 Having so found, this Court also finds that AIGDC’s offer at the close of evidence at trial of $6 million which, with Professional Tree’s $550,000, would have provided the Rhodeses with a total of $6.55 million was also within the range of reasonable offers.

 This Court also recognizes that the Supreme Judicial Court in Bobick v. United States Fid. & Guar. Co. held that it was error for a Superior Court judge to grant summary judgment in a Chapter 176D/93A case based on the plaintiffs failure to prove that he would have been willing to accept a reasonable settlement offer at any time before trial. 439 Mass. at 662-63. The Bobick Court, however, simply cited Hopkins for its ruling, and did not provide any analysis of causation beyond that in Hopkins. Id. at 663. Moreover, this finding of error was dictum because the Court found that the settlement offer was reasonable as a matter of law, and therefore did not need to address the question of causation. Id.

 This Court does find that AIGDC’s failure to provide a prompt settlement offer was willful and knowing. AIGDC had been warned for months before May 1, 2004, by GAF, GAF’s defense counsel, and GAF’s coverage counsel, that it should make a settlement offer in response to the plaintiffs’ August 13, 2003 settlement demand, but AIGDC failed to heed these-warnings and decided to make no settlement offer until the mediation was conducted one month before trial. In short, as this Court earlier found, AIGDC did not delay its settlement offer to conduct the investigation needed to make liability reasonably clear: it delayed it because.it thought it would be in a better strategic posture if the offer were postponed until the mediation and it did not wish the mediation to occur until trial was nearly imminent.

 In Kapp and Yeagle, the Supreme Judicial Court and the Appeals Court understood that the actual damages would generally be loss of use damages, that is, lost interest. In fact, if the case did not settle because of the absence of a reasonable settlement offer and proceeded to judgment, the plaintiff would have suffered loss of use damages only if the reasonable settlement offer should have been provided before the complaint was filed because the plaintiff would receive 12 percent per annum common interest on the amount of the judgment from the date the complaint was filed. The more likely form of actual damages would be “the costs and frustrations that are encountered when litigation must be instituted and no settlement is reached,” including any attorneys fees or costs incurred by the plaintiff from having to proceed to trial. Clegg, 424 Mass. at 419.

 The roughly $11.3 million judgment issued on September 28, 2004 increased by one percent per month as a result of post-j udgment common interest. Therefore, with 2 1/2 months having passed since the judgment, the amount due under the judgment by December 17, 2004 was roughly $11.6 million.

 This Court calculated the interest by multiplying the amount AIGDC ultimately offered ($8.965 million) by .05. This Court did not include the amount paid by Zurich on December 22, 2004 in this calculation, which included all post-judgment interest through that date.

 This Court will change this hearing date if it interferes with any counsel’s trial or vacation schedule.